(92 Misc. Rep. 16)

HAMLIN, Commissioner of Safety, v. BENDER.

(Supreme Court, Special Term, Oneida County. October, 1915.)

1. COURTS ☞91—STARE DECISIS.
   The judge of the Supreme Court at a Special Term should follow a decision made by the Appellate Division of another department, until his own Appellate Division or the Court of Appeals pronounces a contrary rule of law.
   [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 313, 325, 326; Dec. Dig. ☞91.]

2. NUISANCE ☞64—VIOLATION OF SUNDAY LAW—PUBLIC AMUSEMENTS.
   While the mere act of conducting a moving picture show in an inclosed room on Sunday is not of itself a violation of the Sunday laws, it becomes unlawful when performed under circumstances making it a public nuisance.
   [Ed. Note.—For other cases, see Nuisance, Cent. Dig. § 138; Dec. Dig. ☞64.]

3. NUISANCE ☞61—OPERATION OF MOVING PICTURE THEATER—SUNDAY—VICINITY OF CHURCH.
   The operation on Sunday of a moving picture theater to which an admission was charged constituted a nuisance, where the theater was on a thickly populated street near a large church and parish buildings where religious services were held, and it appeared that the attendants on such services would be obliged to pass the theater and the box office, which was but a few feet from the sidewalk, and signs and posters advertising the exhibition.
   [Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 142–151; Dec. Dig. ☞61.]

4. EVIDENCE ☞5—JUDICIAL NOTICE—OPERATION OF MOVING PICTURE THEATER.
   In a suit to enjoin the operation of a moving picture theater on Sunday in the vicinity of a church, the courts will take judicial notice of the fact that during the hours when the pictures are exhibited people largely congregate about the entrance of the theater to such an extent as to cause a congestion of travel.
   [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 4; Dec. Dig. ☞5.]

5. SUNDAY ☞2—STATUTES—CONSTRUCTION—OBSERVANCE OF SABBATH.
   Statutes regulating the observance of the Sabbath, being remedial, should be liberally construed in respect to the mischiefs to be remedied.
   [Ed. Note.—For other cases, see Sunday, Cent. Dig. § 2; Dec. Dig. ☞2.]

6. NUISANCE ☞59—DISTINCTION BETWEEN "TRESPASS" AND "NUISANCE."
   The distinction between "trespass" and "nuisance" is that the former is a direct wrong, while in the latter infringement is the result of an

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

act not wrongful in itself, but only in the consequences which may flow from it.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 135, 136; Dec. Dig. ☞59.

For other definitions, see Words and Phrases, First and Second Series, Nuisance; Trespass.]

7. NUISANCE ☞80—INJUNCTION—RIGHT.

Injunction will lie to restrain the commission of nuisances, especially where they are of a continuous character.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. § 192; Dec. Dig. ☞80.]

8. NUISANCE ☞82—PARTIES—COMMISSIONER OF PUBLIC SAFETY.

Under Second Class Cities Law (Consol. Laws, c. 53) §§ 4, 152, authorizing the commissioner of public safety of cities of the second class to sue to restrain nuisances, the commissioner was the proper person to bring an action to enjoin the operation of a moving picture theater on Sunday in the vicinity of a church.

[Ed. · Note.—For other cases, see Nuisance, Cent. Dig. § 195; Dec. Dig. ☞82.]

Injunction by Joseph Hamlin, Commissioner of Safety of the City of Utica, against Austin W. Bender. Decree for plaintiff.

N. G. Powers, Asst. Corp. Counsel, of Utica, for plaintiff.
John J. Finn, of New York City, for defendant.

EMERSON, J. The defendant is engaged in conducting a moving picture theater at No. 325 Bleecker street in the city of Utica. The auditorium where the exhibition is held is located on the north side of the street and is back about 80 feet from the sidewalk, the approach being through an alley about 20 feet in width. The seats in the auditorium face to the north, and the pictures are reflected upon a screen on the northerly side by means of a cinematograph projector located in the southerly end of the room and operated by a paid employé of the defendant. In connection with the exhibition music is furnished by an orchestra which, with other attendants, are also paid employés of defendant. Near the entrance to the alley and but a few feet from the sidewalk is a box office for the sale of tickets, while bills and posters advertising the pictures to be shown are prominently displayed on the outside of the theater and on the street.

Bleecker street is one of the main thoroughfares of the city and the defendant's theater is in a thickly populated section, where people pass in going to and returning from religious services. A short distance westerly from defendant's theater the street is crossed by John street, and on the southwest corner of Bleecker and John streets St. John's Church is located, which is one of the largest churches in the city. This church is 316 feet in a direct line from defendant's theater and the entrance thereto is plainly visible from one of the main entrances to the church. There are also other institutions in the immediate vicinity of the church which are connected with its administration, such as a convent, a school which is conducted by the Sisters of Mercy, and Assumption Academy, which is a parochial school. St. John's Church

is largely attended, and the Sunday services there conducted occupy from time to time practically all of the day.

The defendant had for some time been engaged in conducting this theater as a place of public amusement where moving pictures were exhibited to people congregated in the theater and streets and sidewalks adjacent thereto; an admission fee being exacted from each person entering, which was paid at the box office located near the street. Prior to Sunday, April 25, 1915, the defendant had perfected arrangements to open up said theater on that day and to exhibit moving pictures there, for which an admission fee was to be charged, and to that end had advertised the same as a Sunday show, and threatened and intended on that day and thereafter on Sundays to do the same. The plaintiff, who is the commissioner of safety of the city of Utica, acting under the provisions of the statutes applicable to said city, thereupon brought this action, and asks the judgment of the court enjoining and restraining the defendant from so operating and conducting said theater on Sundays.

It is strenuously urged by defendant's counsel that the acts above set forth, which defendant proposed to do, are not a violation of the Sunday laws of our state, and the case of People v. Hemleb, 127 App Div. 356, 111 N. Y. Supp. 690, is pressed upon my attention as a controlling authority to that effect. In the Hemleb Case the Appellate Division, Second Department, held that the mere act of conducting a moving picture show was not of itself a violation of the Sunday laws. It was said in that case that the statute, in prohibiting all shooting, hunting, fishing, playing, horse racing, gaming, and all other public sports, exercises, or shows, referred to open air sports and exhibitions, and hence an exhibition given in an inclosed building was not within its condemnation. This decision was made by a bare majority of the court, two judges concurring in the opinion and two judges uniting in a very strong and vigorous dissent to that proposition. I am frank to say that this decision does not appeal to my good judgment, as it seems to me that it is based on entirely erroneous premises. I should suppose that an exhibition to which the public was invited, and to which one and all were admitted indiscriminately upon payment of an entrance fee thereto, was a public exhibition, whether held in an open field in an inclosed space, or in a room in some building, and that the mere fact that it happened to be given in an inclosed building did not make it a private exhibition and therefore remove it from the prohibition of the statute. Furthermore, the opinion in that case completely ignores the violation of the laws in relation to Sunday labor, which must necessarily result from the operating of a moving picture show on that day and which, it would seem, would subject the party to punishment. People v. Lynch, 156 App. Div. 601, 141 N. Y. Supp. 728.

[1] The decision is also at variance with the conclusions at which Justice Foote arrived in More v. Owen, 58 Misc. Rep. 332, 109 N. Y. Supp. 585, and which, it seems to me, involves a correct exposition of the Sunday laws. The rule of stare decisis is, however, firmly imbedded in our law, and, while the decisions of other Special Terms are by

no means controlling, it is held to be the duty of a judge at Special Term to follow a decision made by the Appellate Division of another department until his own Appellate Division or the Court of Appeals pronounces a contrary rule of law. Burt v. Powis, 16 How. Prac. 289; Malan v. Simpson, 20 How. Prac. 489, 490; Loring v. United States Vulcanized Gutta Percha Co., 30 Barb. 644; Hardenburgh v. Crary, 50 Barb. 32.

[2] Bowing, therefore, to the above rule, I must hold that the Hemleb Case is decisive as to the facts there involved, and that the mere act of conducting a moving picture show in an inclosed room is not, in and of itself alone, a violation of the Sunday laws. But it needs no argument to show that what may be lawful under some circumstances may become unlawful when performed under other circumstances and conditions, and, so far as judicial precedents are concerned, they largely lose their value where an essentially different state of facts is involved. Crane v. Bennett, 177 N. Y. 107, 69 N. E. 274, 101 Am. St. Rep. 722. Thus, as an example, it will be observed that the justice who wrote the prevailing opinion in the Hemleb Case decided in People v. De Mott, 38 Misc. Rep. 171, 77 N. Y. Supp. 249, that Sunday baseball playing was not in and of itself a violation of the Sunday laws, while in the case of People v. Poole, 44 Misc. Rep. 118, 89 N. Y. Supp. 773, the same justice held that such a game was unlawful where an admission fee was charged to witness the same. In other words, a business may be innocuous of itself, and yet be conducted in such a manner and occasion such results that it would be unlawful as creating a nuisance. The rule in this regard is clearly stated in Doellner v. Tynan, 38 How. Prac. 176, where it is said that if a trade or business, otherwise lawful, is carried on in such a manner as to render the enjoyment of life and property uncomfortable, it is a nuisance. The rule of the common law, that a man shall so use his own as not to interfere with others, extends to every act as well as to every use, and the mere lawfulness of a trade or calling will not excuse an interference with the comfortable enjoyment of his property by another.

It is said that the whole doctrine of nuisances is based upon the great law of Christian morality, which requires every man to do to others as he would have others do to him. "Sic utere tuo ut alienum non lædas" is the maxim of the law. Hence it is that acts in themselves lawful become wrongful in consequence of the time or place or manner of performing them. First Baptist Church v. Schenectady & Troy R. R. Co., 5 Barb. 83. In line with this rule it has been uniformly held that acts which did not of themselves violate the Sunday laws became unlawful when performed under such circumstances as to seriously interrupt and disturb the repose and religious liberty of the community. In People v. Dennin, 35 Hun, 327, it was held inferentially that a Sunday game of baseball would be unlawful if conducted under such circumstances as to constitute a serious interruption of the repose and religious liberty of the community. While this case was disapproved of by the Court of Appeals in People v. Moses, 140 N. Y. 214, 35 N. E. 499, it was only upon the point that the court erred in

not holding that the acts proven constituted of themselves such a violation. To the same effect are People v. De Mott, 38 Misc. Rep. 171, 77 N. Y. Supp. 249; People v. Hesterberg, 43 Misc. Rep. 510, 89 N. Y. Supp. 498; People v. Roach, 61 Misc. Rep. 42, 114 N. Y. Supp. 742.

It has been held that such a serious interruption of the repose and religious liberty of the community results from the advertising of a Sunday game of baseball and the imposition of an admission fee to the same. People v. Poole, 44 Misc. Rep. 118, 89 N. Y. Supp. 773; Ontario Field Club v. McAdoo, 56 Misc. Rep. 285, 107 N. Y. Supp. 295; People ex rel. Hart v. Demerest, 56 Misc. Rep. 287, 107 N. Y. Supp. 549; Brighton Athletic Club v. McAdoo, 47 Misc. Rep. 432, 94 N. Y. Supp. 391; Southern Tier Base Ball Ass'n v. Day, 69 Misc. Rep. 53, 125 N. Y. Supp. 733; Matter of Rupp, 33 App. Div. 468, 471–473, 53 N. Y. Supp. 927. And in People v. Moses, 140 N. Y. 214, 35 N. E. 499, it was held that the act of a single person fishing in a private pond on Sunday was unlawful, because, being committed within the observation of a number of people, it constituted a serious interruption of the repose and religious liberty of the community.

Recurring now to the Hemleb Case, it will be seen that the facts are entirely different from those now before the court. So far as the report of the former case discloses, there were no circumstances whatever, aside from the mere exhibition of the pictures, which would in any manner tend to interrupt or disturb the repose and religious liberty of the community. Indeed, it did not even appear in that case that an admission fee was charged, which fact was commented on in the course of the opinion.

[3, 4] On the contrary, it appears in the present case that an admission fee was to be charged; that the defendant's place of amusement was upon a most thickly populated street; that it was in the immediate vicinity of a large church and parish buildings connected therewith, where religious services were largely attended and Sunday schools were held; and that people attending these divine services, as well as children attending the Sunday schools, would be called upon to pass and repass the defendant's place of amusement, where signs and posters were displayed advertising the exhibition that was to be given within the building, and where a signboard on the outer edge of the sidewalk informed passers-by that the show was then going on. It also appears that the box office was but a few feet within the sidewalk, and we know, as a matter of common observation, and therefore may take judicial notice of the fact (Oppenheim v. Leo Wolf, 3 Sandf. Ch. 571; Jordan v. City of New York, 44 App. Div. 152, 60 N. Y. Supp. 696), that during the hours that moving pictures are exhibited people largely congregate about the entrance thereto, going in and out to such an extent that at times travel may be somewhat congested in front of the building. It is quite true that defendant claims he intended to use his private office, which was further from the street, as a box office; but we must take conditions as they are, and as the business has been conducted in the past, rather than an unfulfilled declaration of intention in determining the character of the defendant's exhibition.

If, then, the fact of advertising a baseball game and charging an admission fee thereto, or the act of a lone fisherman performed within public view, is sufficient of themselves to interrupt and disturb the repose and religious liberty of the community, how much more so would it be in this case, when the defendant's business would be conducted almost under the doors of the sanctuary, where people must pass and repass in going to and returning from their devotions, a place where Sunday plays are advertised and Sunday crowds are gathered, and where children going to and returning from Sunday school must necessarily have their minds diverted from their divine instruction and from the sacred character of the day.

The observance of the Sabbath day as a day of rest, accompanied by a cessation from all secular employment, is among the first and most sacred institutions of the Christian religion. Indeed, this principle has been instilled in the human mind, and its observance practiced by Jew and Christian, ever since the fourth commandment was thundered down from the heights of Sinai. Ecclesiastical history is uniform in showing that such observance, as a rule for all who profess themselves Christians, has been recognized and practiced in obedience to the edicts of emperors and the canons of the church from the earliest rise of Christianity through all the ages of its progress. Constantine the Great, after his conversion, issued an edict commanding the religious observance of Sunday as a day of rest, and later on the younger Valentinian promulgated a decree to the same effect. The same exhortation was contained in the twentieth canon of the council of Nice and in the twenty-ninth canon of Laodicia.

It was said by Justice Foote in Moore v. Owen, 58 Misc. Rep. 338, 109 N. Y. Supp. 585, that the Christian Sabbath is one of the civil institutions inherited from our ancestors, who settled this country and formed our government, and who brought it with them as an already long-existing institution; one of its leading features being that it should be given up to rest and religious observance. In Matter of Rupp, 33 App. Div. 472, 53 N. Y. Supp. 927, our own Appellate Division says that:

"Our laws for the observance of the Sabbath are founded upon the command of God at Sinai that we should 'Remember the Sabbath Day to keep it holy,'" and that "the experience of mankind demonstrates that the setting apart of one day in seven is not only conducive to the spiritual welfare of the people, but it is essential to the rest and recuperation which every one needs at stated intervals from the cares, burdens, and anxieties of life. The Sabbath, therefore, is the result of the highest dictates of public policy as well as of religious duty. The Sabbath existed before Constitutions or statutes, and was sanctioned by the common law."

[5] So, also, in speaking of our Sunday laws, the Court of Appeals, in Smith v. Wilcox, 24 N. Y. 354, 82 Am. Dec. 302, says that they are in harmony with the religious sentiment of the public, and for the support and maintenance of public morals and good order. Their design is to secure to the day that outward respect and observance which is due to it as the acknowledged Sabbath of the great mass of the people, to protect the religion of the community from contempt and unseemly hindrances, and to give to its professors the liberty of quiet

and undisturbed worship on the day set apart for that purpose. To this end the acts regulating the observance of the Sabbath are remedial statutes, and to be construed liberally in respect to the mischiefs to be remedied.

[6] It seems to me, under these circumstances, that acts which so clearly interfere with the sanctity of the Sabbath as a day of rest and religious devotion, which so divert the mind from divine and sacred thoughts, and which so clearly interrupt the repose and religious liberty of the community, as do those which the defendant proposes to perform, come well within the definition of a common nuisance. True, the act which the defendant proposed to do might not of itself be unlawful, but it would become unlawful from the consequences which would arise from the act. Thus in High on Injunctions (volume 2, § 739) it is said that the distinction between trespass and nuisance is that the former is a direct wrong, while in, the latter the infringement is the result of an act not wrongful in itself, but only in the consequences which may flow from it, citing Reynolds v. Clarke, 2 Ld. Raymond, 1399, 1402.

Coming now to the definition of a common nuisance, Blackstone says that it is a thing that worketh hurt, inconvenience, or damage, and that it is an offense against the public order and economical regimen of the state, in that it annoys the community in general; while our Penal Law defines a public nuisance as a crime against the order and economy of the state, consisting in acts which annoy, injure, or endanger the comfort, repose, health, or safety of any considerable number of people or offend public decency. Penal Law (Consol. Laws, c. 40) § 1530.

Wood, in his work on Nuisances, defines it as that which produces an annoyance, or that disturbs or is offensive, and says that a public nuisance is created where public rights are violated. This author classes as among public nuisances outcries in the public streets calculated to excite, alarm, or disturb the peace. So, also, it is said by the Court of Appeals in Ackerman v. True, 175 N. Y. 360, 67 N. E. 629, that interference with public and common rights creates a public nuisance. As illustrative of what interference with the rights of the community may constitute a nuisance, reference may be had to the case of Soltau v. De Held, 2 Sim. (N. S.) 133, 42 Eng. Ch. Rep. (9 E. & E.) 104, where the ringing of bells in a Roman Catholic Church was held to be a nuisance. The vice chancellor said that the ringing of such bells was an annoyance to residents in the locality, and was an invasion of the domestic comfort and enjoyment of their homes. Not belonging to the Established Church, it was not a church in the eye of the law, and therefore the ringing of the bells was not justified as an act done in the line of religious exercise and devotion. For this reason he declared it to be a nuisance.

In Rex v. Moore, 3 Barn. & Ad. (23 Eng. C. L.) 184, the defendant maintained grounds for shooting pigeons, and as a result crowds collected outside his grounds to shoot escaping birds. It was held that he committed a nuisance in causing this crowd to assemble outside his grounds. Lord Tenterden, C. J., said that if a person collects to-

gether a crowd of people to the annoyance of his neighbors he commits a nuisance, and Littledale, J., said that the defendant was answerable for the probable consequences of his acts the same as if it had been his actual object. In Walker v. Brewster, L. R. 5 Eq. Cas. 25, it was held that an entertainment, otherwise lawful, which drew together a crowd of noisy and disorderly persons, was a nuisance.

In our own state it was held in First Baptist Church v. Schenectady & Troy R. R. Co., 5 Barb. 79, above cited, that acts of defendant, performed in a lawful business, which unnecessarily disturbed religious services were a nuisance, while in Jaques v. National Exhibit Co., 15 Abb. N. C. 250, it was held that a puppet show in a window for advertising purposes, which drew together a crowd of persons, was likewise a nuisance. I cannot distinguish this case in principle from Rex v. Moore, Walker v. Brewster, and Jaques v. National Exhibit Co., supra. In all of said cases the acts which the defendants did were lawful, but the mischief resulted from the consequences arising from those acts, the effect of which was to disturb the comfort and repose of the neighborhood, and, because of this disturbance, the acts were adjudged to be nuisances.

It was said in the Rupp Case, above cited, that the observance of the Sabbath as a day of rest and religious devotion was a common-law duty, having its origin before the advent of Constitutions or the enactment of statutes, and, while this duty at common law was somewhat imperfect so far as criminal prosecutions for its violation was concerned, as was held in Rex v. Brotherton, 2 Strange, 702, the great moral obligation still remained to refrain from such acts as violated the sanctity of the day and disturbed the comfort, repose, and religious liberty of the community. If, then, it is a nuisance to disturb a religious meeting by making unnecessary noises in a lawful business, as was held in the Schenectady Baptist Church Case, 5 Barb. 79, supra, I cannot see why it should not be so held where the acts complained of so directly affect the religious liberty and solemnity of the day.

[7] In the light of the above authorities it seems to me that the acts which the defendant proposed to do would create a public nuisance, and the remaining question is whether a court of equity will restrain the commission of the same. The granting of injunctions to restrain the commission of nuisances is a well-settled branch of equity jurisprudence, especially where such nuisances are of a continuous character. This arises from the fact that equity can give a more perfect remedy than law by abating nuisances already existing and by restraining their commission in the future, thereby affording prompt relief and avoiding a multiplicity of actions. 2 Story, Eq. Juris. §§ 921, 924; 1 High, Inj. § 739; 1 Pom. Eq. Juris. §§ 252, 271, 273; 3 Pom. Eq. Juris. § 1349.

In the case of Van Bergen v. Van Bergen, 2 Johns. Ch. 273, Chancellor Kent says that there is no doubt as to the power of a court of equity to restrain as well as abate a nuisance, while in the cases of Soltau v. De Held and Walker v. Brewster, supra, injunctions were granted in the first case restraining the ringing of the church bells

and in the latter case restraining defendant from so conducting his business as to cause crowds of people to collect about his premises. High in his work on Injunctions (volume 2, § 782) states that the general principles of equity in relation to restraining nuisances apply to houses of ill fame, the continuance of which may be restrained upon proper application. See, also, to same effect, Cranford v. Tyrrell, 128 N. Y. 341, 28 N. E. 514.

In McKeon v. See, 51 N. Y. 307, 10 Am. Rep. 659, the Court of Appeals say that if a nuisance is a continuing one the proper remedy is a bill for injunction in order to prevent a multiplicity of suits. See, also, to same effect, Williams v. N. Y. C. & H. R. R. R. Co., 16 N. Y. 97, 111, 69 Am. Dec. 651; 2 Story, Eq. Juris. § 925; Adams v. Popham, 76 N. Y. 410, 413; Kobbe v. Village of New Brighton, 23 App. Div. 243, 48 N. Y. Supp. 990. So also it is held that, although a business be lawful, if it is so conducted as to create a nuisance, equity will enjoin such use. Jaques v. National Exhibit Co., 15 Abb. N. C. 250.

[8] In view of the general principles of equity, as elucidated by the above authorities and the judicial precedents therein set forth, I can see no reason why injunctive relief should not be granted in this case. I think the plaintiff is the proper person to maintain this action. Courts of equity may restrain an existing or threatened nuisance at the suit of the people by their Attorney General, or of a private individual who sustains special and peculiar injury therefrom distinct from that suffered by him in common with the public. 3 Pom. Eq. Juris, § 1349; Penniman v. New York Balance Co., 13 How. Prac. 40; People v. Metropolitan Tel. & T. Co., 11 Abb. N. C. 304; Id., 64 How. Prac. 120; People v. Ahearn, 124 App. Div. 840, 845, 109 N. Y. Supp. 249; Old Forge Co. v. Webb, 31 Misc. Rep. 316, 65 N. Y. Supp. 503.

The statute in this case, however, confers express power upon the commissioner of public safety of cities of the second class to maintain actions to restrain nuisances. Second Class Cities Law, §§ 4, 152. The commissioner, therefore, represents the people for the purpose of such an action, and may bring and prosecute any action that could otherwise be maintained in the name of the people. While there may be some question as to the form of the action, that point does not seem to have been raised in the case, and therefore need not be considered here.

My conclusions are that the plaintiff is entitled to a decree restraining the operation of the defendant's place of business as a moving picture show on Sundays, and such a decree is accordingly ordered, together with costs.

Ordered accordingly.