STAR COMPANY, Plaintiff, *v.* EDWARD F. BRUSH, as. Mayor of the City of Mount Vernon, et al., Defendants.

(Supreme Court, New York Special Term, June, 1918.)

Injunctions — ordinance prohibiting sale and distribution of certain newspapers — city of Mount Vernon.

There being nothing in the statute (Laws of 1892, chap. 182), incorporating the city of Mount Vernon, to indicate that there was any legislative intent to confer upon the local authorities of the city authority to pass an ordinance making it unlawful, from the date that it should take effect until the end of the present war, to print, publish, circulate, sell or distribute, or cause to be printed, published, circulated, sold or distributed certain designated newspapers and declaring any violation of the ordinance to be a misdemeanor, etc., an injunction *pendente lite* will be granted the publisher of said newspapers on its complaint that the enforcement of said ordinance will infringe its property rights.

MOTION for injunction *pendente lite.*

Scott, Gerard & Bowers (Francis M. Scott, James W. Gerard and S. D. Bowers, of counsel), for plaintiff and motion.

J. Henry Esser, corporation counsel, for defendants, opposed.

GIEGERICH, J.  The motion is made by the plaintiff to obtain an injunction pending final judgment in the action.  The plaintiff is the publisher of two newspapers, one known as the New York *American* and the other known as the New York *Evening Journal*.  The defendants are the mayor and the aldermen and the police commissioner of the city of Mount Vernon.  The

complaint alleges that the papers named have a circulation respectively of several hundred thousand copies and that there have been sold in the city of Mount Vernon within the last month a large number of thousands, specifying the exact number of thousands in each case. It is further alleged that on the 14th day of May, 1918, the defendants other than the police commissioner passed a certain ordinance making it unlawful from the date that ordinance should take effect until the end of the present war to print, publish, circulate, sell or distribute or cause to be printed, published, circulated, sold or distributed the newspapers named, and declaring any violation of the ordinance to be a misdemeanor punishable by a fine of not exceeding $500 or by imprisonment not exceeding six months or by both, and that the defendant mayor had signed the ordinance. It is further alleged that the defendant aldermen had no right or power to pass the ordinance, and that the defendant mayor had no right to approve the same, and that if the ordinance should be enforced and the sale and distribution of the said newspapers interfered with and the agents of the plaintiff or other persons selling or distributing the papers should be arrested, then the plaintiff would suffer irreparable loss for which it has no adequate remedy at law. There are further allegations setting forth that the act of incorporation of the city of Mount Vernon makes it the duty of the mayor of that city to see to it that the ordinances of the common council be executed and to arrest or cause the arrest of all persons violating the same; and further makes it the duty of the aldermen to make such arrests or cause them to be made. The complaint further pleads various statutes by which it is made the duty of the police commissioner to maintain the municipal ordinances of the said city and made the duty of the police force to enforce such ordinances.

Although the counsel for the defendants expressly disclaims any admission of the invalidity of the ordinance in question, he did not in his oral argument, nor does he in his brief, attempt to establish its validity, but bases his opposition to the motion upon the ground that the complaint does not allege facts sufficient to make out a cause of action in equity and other grounds, all of which will be discussed later in this opinion. At the outset, however, in view of the conclusion I have reached on the whole motion, it will be necessary to consider this question not discussed by the defendants' attorney and to determine whether or not the ordinance is a valid one. The powers of the common council, which is the collective designation of the aldermen, are set forth at length in title 6 of chapter 182 of the Laws of 1892, being the act of incorporation of the city of Mount Vernon. Those powers seem to be no greater, in this particular instance, than are customarily conferred by the legislature upon similar city officers, being in general to preserve the peace and welfare of the community. In section 166 of the act of incorporation, those powers are specified in detail in no less than sixty-three subdivisions, expressly conferring authority, among other things, to prohibit gambling and disorderly houses and immoderate driving and the storage of gunpowder and other explosives and combustibles and other enumerated powers to protect the community from nuisances; but there is nothing that I find in that act to indicate that the legislature had any intention to attempt to confer upon the local authorities of the city any such powers as were attempted to be exercised by the ordinance in question. Apparently no other local authority has ever attempted in this state to exercise such authority, because no case arising in our courts has been found dealing with such a situation. In fact the only case

that has been found in any state arose in Texas in 1893. It is entitled " *Ex parte Neill,*" and is reported in 32 Texas Crim. Rep. 275, 22 S. W. Rep. 923, and 40 Am. State Rep. 776. In that case the city council of the city of Seguin undertook to ordain that the Sunday *Sun,* a paper published in Chicago, was a public nuisance and to prohibit its circulation within the corporate limits of the city. The court declared the ordinance to be invalid and beyond the power of the common council, among other things saying: " The power to prohibit the publication of newspapers is not within the compass of legislative action in this State, and any law enacted for that purpose would clearly be in derogation of the Bill of Rights. ' The constitutional liberty of speech and of the press, as we understand it,' says Mr. Cooley, ' implies a right to freely utter and publish whatever the citizen may please, and to be protected against any responsibility for so doing, except so far as such publications, for their blasphemy, obscenity or scandalous character, may be a public offense; or as by their falsehood and malice they may injuriously affect the standing, reputation, or pecuniary interests of individuals. Or to state the same thing in somewhat different words, we understand liberty of speech and of the press to imply not only liberty to publish, but complete immunity from legal censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords ' (Cooley Const. Lim. p. 518). To prevent the abuse of this privilege, as affecting the public, the Legislature has prescribed penalties to be enforced at the suit of the State, leaving the matter of private injuries to be determined between the parties in civil proceedings. We are not informed of any authority which sustains the doctrine, that a municipal corporation is invested with the

power to declare the sale of newspapers a nuisance. The power to suppress one concedes the power to suppress all, whether such publications are political, secular, religious, decent or indecent, obscene or otherwise. The doctrine of the Constitution must prevail in this State, which clothes the citizen with liberty to speak, write or publish his opinion on any and all subjects, subject alone to responsibility for the abuse of such privilege." Constitutional protection similar to that referred to in the extract above quoted is provided by section 8 of article 1 of the Constitution of this state in the following language: " Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press;" and, indeed, such constitutional protection is provided everywhere in the Union by the First Amendment to the United States Constitution, which provides that: " Congress shall make no law * * * abridging the freedom of speech, or of the press." In *People* v. *Most,* 171 N. Y. 423, at page 431, the Court of Appeals said: " While the right to publish is thus sanctioned and secured, the abuse of that right is excepted from the protection of the Constitution, and authority to provide for and punish such abuse is left to the legislature. The punishment of those who publish articles which tend to corrupt morals, induce crime or destroy organized society, is essential to the security of freedom and the stability of the state. While all the agencies of government, executive, legislative and judicial, cannot abridge the freedom of the press, the legislature may control and the courts may punish the licentiousness of the press. ' The liberty of the press,' as Chancellor Kent declared in a celebrated case,' ' consists in the right to publish, with impunity, truth, with good motives, and for justi-

fiable ends, whether it respects governments, magistracy or individuals ' (*People* v. *Croswell*, 3 Johns. Cas. 336, 393). Mr Justice Story defined the phrase to mean ' that every man shall have a right to speak, write and print his opinions upon any subject whatsoever, without any prior restraint, so always, that he does not injure any other person in his rights, person, property or reputation; and so always, that he does not thereby disturb the public peace, or attempt to subvert the government ' (Story's Commentaries on the Constitution, sec. 1874)." So in *Stuart v. Press Publishing Co.,* 83 App. Div. 467, at page 477, it was said: " Individuals are free to talk and the press is at liberty to publish, and neither may be restrained by injunction, but they are answerable for the abuse of this privilege in an action for slander or libel under the common law, except where by that law or by statute, enacted in the interest of public policy, the publication is privileged and deemed for the general good, even though it works a private injury." It would seem that the legislature itself, from which the defendants necessarily derive such power as they have, would have no authority to prohibit in advance the plaintiff or any other accused person from printing and issuing newspapers or other publications. If any publications made in the past by this plaintiff have been unlawful, the law provides a punishment, but such punishment must be for some act done in the past and not because it is anticipated that some act may be done in the future. In *Ulster Square Dealer* v. *Fowler,* 58 Misc. Rep. 325, Mr. Justice Carr, at pages 327 and 328, said: " No one can take unto himself the right of suppressing in advance the publication of the printed sentiments of another citizen on any public or private question. * * * The plaintiff has the right to publish a newspaper; and defendants cannot determine for

themselves in advance as to the propriety of that publication and set about to suppress it, every time the plaintiff attempts to publish it, without committing a continuous trespass against the plaintiff's property rights." I am clearly of the opinion, therefore, that the local authorities had no power to ordain what they attempted to ordain in this case, and that their act is a nullity. This conclusion alone, however, does not entitle the plaintiff to the relief which it seeks. On behalf of the defendants it is argued with great earnestness that the complaint does not allege facts which warrant the interposition of a court of equity by injunction or, indeed, which entitle the plaintiff to be in a court of equity at all. I cannot agree with this contention, however. The complaint alleges large sales made heretofore of the plaintiff's newspapers within the city of Mount Vernon, and further alleges that, if the ordinance of prohibition is enforced, the plaintiff will suffer irreparable loss, for which it has no adequate remedy at law. Proof in the form of an affidavit was submitted at the time the order to show cause was obtained, and forms a part of the motion papers. I do not think it can be doubted that the loss which the plaintiff would sustain if the sale of its papers should be prohibited or interfered with as the ordinance seeks would be a loss which would be incapable of proof in an action at law and, consequently, the remedy at law would be inadequate. Neither do I think there is any force in the objection made on behalf of the defendants that the ordinance cannot become operative until it has been published for a prescribed period and that in any event the ordinance may never be enforced. This is not a case like *People* v. *Canal Board,* 55 N. Y. 390, relied upon by the defendants, where, at page 397, the court said: "The courts cannot be called upon to pass upon the validity of a law, upon the mere sug-

gestion that it is void, and that possible action may be had under it, and in advance of any proceedings had or threatened by the officials, who, if the law were valid, would be called upon or authorized to act. The appeal presents simply in this view a theoretical or speculative question, which, whatever its merits, can only be judicially decided when facts arise giving the court jurisdiction, and making a decision necessary, and giving it practical effect when made.'' The present is manifestly not such a case as the court was there speaking of. This is not a case where the defendants may or may not act under a law giving them power to act, but is a case where the defendant mayor and aldermen have themselves taken the affirmative action and passed the ordinance of which complaint is made. Neither can it be assumed that the defendant police commissioner, whose duty and obligation it is, as the complaint and the affidavit show, to enforce the municipal ordinances, will neglect to perform the duty which the law has placed upon him. Neither do I think the defendants' counsel states this case accurately when he says that the only relief sought is an injunction against the enforcement of the criminal law through its natural and orderly channels. If this were an application made by a newsdealer in the city of Mount Vernon who was in the habit of selling the proscribed newspapers, then the line of decisions relied upon might be applicable and such a newsdealer, if arrested, might have his appropriate and efficacious remedy by habeas corpus and also, for the wrong he might sustain, by an action for damages. *Fincke* v. *Police Commissioners,* 66 How. Pr. 327; *Burch* v. *Cavanaugh,* 12 Abb. (N. S.) 410. The plaintiff, however, would not have such a remedy as the local newsdealer would have. The grievance of the plaintiff is not that it or any of its officers or employees are in danger of being

arrested, but that the enforcement of the ordinance in question will infringe its property rights. In this respect the case is like *United Traction Co.* v. *City of Watervliet,* 35 Misc. Rep. 392, where a street railroad company sought to enjoin a city from enforcing a penal ordinance limiting the speed of street cars in city streets to six miles an hour, it appearing that such a speed limitation was a detriment to the company and to its service to the public. At page 394 the court spoke as follows: " It may be conceded that the enforcement of a penal ordinance will not, as a general rule, be restrained by injunction, for the reason primarily that its validity is a question of law, which may be raised on the part of a person arrested under it by habeas corpus, or by an action for damages (*Coykendall* v. *Hood,* 36 App. Div. 558). But this rule is subject to the qualification which is as well settled as the rule itself, and which is recognized in the case above cited, that a court of equity may in a proper case interfere by injunction to restrain any act or proceeding, whether connected with crime or not, which tends to the destruction or impairment of property or property rights (1 Beach Inj. 75, 76, § 60; 1 High Inj. [3d ed.] § 68). It should be borne in mind that this action is not brought by a person under arrest, or who is threatened with arrest. It is not brought to determine the guilt or innocence of a defendant charged with a misdemeanor. If it were, a court of equity could not be successfully appealed to to restrain the prosecution. On the contrary, it is brought against the municipal authorities upon the allegations that. they have adopted and are attempting to enforce an invalid ordinance, the enforcement of which will result in great injury to the plaintiff's rights. If the ordinance in question is void its enforcement is not only an unlawful impairment of the property rights of the

plaintiff, but the convenience and rights of the travel-
ing public are unjustly infringed. The aid of equity
may, therefore, be invoked on those grounds as well
as to prevent a multiplicity of suits which must ensue
if all the operators of plaintiff's cars are to be arrested
for running them at a rate of speed in excess of that
mentioned in the ordinance." The above case was
cited and followed in *Buffalo Fertilizer Co.* v. *Town
of Cheektowaga,* 61 Misc. Rep. 404, where the court
said (at pp. 409–410): "When an ordinance or
regulation is void and its provisions are sought to
be enforced, any party whose interests are to be
injuriously affected thereby may, and properly ought,
go into a court of equity, and have the execution
of the ordinance or regulation stayed by injunction.
*Mayor of Baltimore* v. *Radecke,* 49 Md. 232, and
cases cited; *Manhattan Iron Works Co.* v. *French,* 12
Abb. N. C. 446; *United Traction Co.* v. *City of
Watervliet,* 35 Misc. Rep. 392." Upon the oral argu-
ment, the learned counsel for the defendants referred
to the state of war now existing and seemed to imply
that the attitude of the court upon this case should
not be the same now as in normal times. Whether
the freedom of the press, as it has heretofore existed
in this country, should be restricted as a war measure
is not a question that can be presented in such
a case as this. It is manifest that, if such restriction
is to be imposed at all, it should be by national and not
by local action. It would be an extraordinary and
deplorable situation, if that freedom of the press,
which we have so jealously guarded and which has
meant so much to us, could, now of all times, when
questions of such supreme importance have to be con-
sidered and decided by the people, be suppressed at
the will of the aldermen or trustees of any city or
village anywhere in the country. No publication would

be safe. Our greatest newspapers and other organs of information and discussion would be at the mercy of little groups of local officials here and there and would be permitted to reach the people or not, according as such groups approved or disapproved the particular news of such publications. Whatever changes the war may necessitate, it is safe to say it will not place such power in such hands, and I say this without in the slightest degree questioning the honesty and good intentions of such officials or their competency to perform the duties for which they were elected by the people and created by the law. I have no hesitation in reaching the conclusion that this motion should be granted, with ten dollars costs.

Motion granted, with costs.