STAR OPERA COMPANY, INC., Plaintiff, v. JOHN F. HYLAN et al., Defendants.

(Supreme Court, New York Special Term, October, 1919.)

Injunctions — when motion to continue an injunction pendente lite denied — when proposed performance of German operas prohibited — city of New York.

> Where plaintiff, a duly licensed theatrical corporation, had contracted to give in the city of New York a series of operas in German during the season of 1919-1920, and prior to the first performance, after a hearing upon the petition of the American Legion opposing the proposed performances, the mayor and other police authorities prohibit the giving of German opera only until the treaty of peace is ratified, a motion to continue an injunction *pendente lite* granted *ex parte* will be denied.

MOTION to continue an injunction *pendente lite*.

Max D. Steuer, for motion.

William P. Burr, corporation counsel (George P. Nicholson and John Lehman, of counsel), opposed.

Martin W. Littleton, for American Legion, opposed.

GIEGERICH, J.    This is a motion made by the plaintiff to continue an injunction *pendente lite*, which injunction was granted *ex parte*. The facts, so far as necessary to state them, are as follows: The plaintiff is a New York corporation, organized in August, 1919, for the purpose, among others, of giving theatrical, operatic and other musical performances, and has contracted to give a series of operas in German during the season of 1919–1920. Prior to the first perform-

ance a petition of the American Legion to stop the performance of German opera was presented to the mayor of the city, who gave a hearing of three hours' duration to those who favored and those who opposed the proposed performances. The giving of the proposed performances in German is opposed by the various local organizations of the American Legion. The public hostility to the proposed project has been rendered more bitter by the fact that it has been widely advertised that the general director and producing manager of the company is a German citizen who has been charged with having stated that he has no intention of becoming an American citizen and stays here only because of the money he can make. He has also been charged with being the author of a song sung by himself celebrating the sinking of the *Lusitania*. Whether all or any of these charges are true, I do not have to attempt to determine. The important fact is that they are made and widely believed, and the effect upon the people, not yet recovered from the passions of the war, is substantially the same as though every charge had been proven. On October twentieth, the evening of the first performance, a riotous crowd of six or seven thousand people filled the streets surrounding the opera house and resisted large bodies of the police when efforts were made to disperse them. On October twenty-first no performance was given. On October twenty-second the riotous demonstrations were still more pronounced, and the collisions with the police were still more serious. Three policemen were seriously injured, one of them having his leg fractured, another one having his hand smashed, and another one having his hip seriously injured. In addition to these injuries about fifty policemen were struck with various kinds

of missiles which the crowd was throwing. The extent of the injuries which the police may have inflicted upon the riotous crowd is not shown, although the affidavits of well-known citizens state that the police showed great self-restraint and handled the situation well. After a careful consideration of the facts appearing in the papers and of the arguments of counsel, I have reached the conclusion that the motion to continue the injunction should be denied. At the outset I may say that I recognize that the production of German opera is an act innocent in itself. It does not follow, however, that an act, innocent under ordinary circumstances, may always be done regardless of time, place or conditions. For instance, shooting pigeons on one's own grounds may be a lawful act, but if, as a result, crowds collect outside the grounds to shoot the escaping birds and become an annoyance, the lawful act becomes a nuisance. *Rex* v. *Moore,* 3 Barn. & Ad. (23 Eng. C. L.) 184. So, too, although the mere act of conducting a moving picture show on Sunday may be lawful, if done in a thickly populated neighborhood, near a large church and on a main thoroughfare along which people pass to and from worship, it may become unlawful and be enjoined. *Hamlin* v. *Bender,* 92 Misc. Rep. 16. On the same principle, although it may be lawful in itself to carry a red flag on the street, it has been held that it may not be done when such a state of public sentiment prevails and under such circumstances as to constitute disorderly conduct. *People* v. *Burman* (Mich.) 117 N. W. Repr. 589. It is easy to imagine other cases where acts, harmless under normal conditions, may be dangerous in time of public excitement. For example, when the inhabitants of a city are inflamed by race riots, it may be permissible, or even necessary, for the police

authorities to prohibit white men from passing into sections of the city inhabited by colored men, and *vice versa;* and this, however harmless or even commendable, may be the purpose of the one thus seeking to pass into a prohibited area. It is no answer to such cases to say that it is the duty of the police to protect innocent people in the exercise of their lawful rights. That is a counsel of perfection. It loses sight of the practical difficulties. So many unreasonable people might choose to exercise unimportant lawful rights as to require the entire police force to protect them and leave the great mass of the community exposed to disorder and lawlessness. In the present case, on the second night of the performance, more than 300 policemen were employed to cope with the disorders. In all such cases, it is conditions, not theories, that the police authorities have to deal with, and the courts should be cautious in overruling the judgment of those charged with the duty of maintaining order. In support of the motion the plaintiff cites the decision I made in *Star Co.* v. *Brush,* 103 Misc. Rep. 631. The cases are widely different in many respects. That was not a case of the exercise by the local authorities of their judgment on a local condition. There the local authorities of a suburban town sought to suppress the circulation of a great metropolitan newspaper because they did not approve its views. Moreover, that case dealt with a constitutional right of supreme importance to the entire people — nothing less than the freedom of the press. This case does not deal with a constitutional right or, in fact, any right at all. The giving of an operatic performance in this city is a privilege which can be exercised only by those who have procured a license to do so from the commissioner of licenses. Greater N. Y. Charter,

§§ 1472, 1473. The power to revoke such licenses is placed by the same statute in the courts of record of the city. Id. § 1476. There is no question presented, however, as to revocation of the license, because no revocation has been attempted. All that the mayor and the other police authorities have forbidden is the giving of the particular kind of opera in question. In passing it may be worth while to point out that there is a manifest difference between giving German opera as a commercial enterprise, with its widely advertised appeal to the public for support, and enjoying German opera privately. The latter is nowise involved in this case. Considering, on the one hand, the unimportant nature of the privilege in question and the transitoriness of the deprivation (the mayor's prohibition, by its terms, is to remain in effect only until the treaty of peace is ratified), and, on the other hand, considering the serious consequences of permitting the plaintiff to continue this privilege, in the particular form it has chosen, the serious personal injuries, the drain upon the police force of men needed throughout the city for the performance of their regular duties, the inconvenience and danger imposed upon the community by having important thoroughfares blocked with crowds of angry men — when these things are considered and weighed against each other, it seems to me there should be little doubt as to the wisdom of the mayor's decision. I have reached the conclusion I have reached in this case with the more satisfaction because of another important and far-reaching reason. It is highly desirable that the passions of the war subside as rapidly as may be. This process cannot be hastened, however, but will be retarded, by ill-advised and premature attempts like the one under consideration. Great numbers of the community, and especially men who have been in the service, have construed this

attempt as a defiance and a challenge. I do not mean to say that such an effect was intended by those who have produced the opera. This is evidently not true, however, of all those who attend. One affiant relates two instances which fell under his observation on a single evening showing ill feeling between the crowds of objectors and those who attended the performances. One man on his way to the opera house in a limousine put his head out of the car and made grimaces and hissed at the crowd, and a woman on her way in a taxicab thrust out her tongue in derision. Ordinarily, these incidents would be too trivial to mention, but now they are significant as indications of a hostile state of mind. I should be sorry to believe that the people who are undertaking and those who are supporting by their attendance this effort to revive German opera in this city are not desirous of allaying the animosities heretofore unfortunately existing between groups of our inhabitants and the animosities necessarily existing between our people and the people of Germany, with whom we have so recently been actively at war and with whom we are not yet formally at peace. It should be remembered that the wounds of the war have not yet healed nor lost their tenderness, and any step taken toward the restoration of things to normal conditions should be taken in the light of that fact, and, if it is found upon trial that public sentiment is not yet prepared for the step, it should not be persisted in. Reconciliation cannot be forced; it can only be brought about by time and by wise efforts toward that end. Motion denied, with ten dollars costs, and the temporary restraining order vacated.

Motion denied, with ten dollars costs.