OPINION OF THE COURT
Kenneth R. Fisher, J.
This action, brought under section 9-21 of the Charter of the *18 City of Rochester (Charter), which authorizes the City to bring an action “to restrain and abate nuisances”, seeks a permanent injunction closing down The Eclipse, a “night club” located on South Washington Street between Main and Broad Streets. The petition seeks a declaration that The Eclipse is a public nuisance, and a closure order preventing operations at the site for a period of one year. The City moves for a preliminary injunction. Evidence has been submitted via affidavit and videotape. No party requested a hearing, and all parties agree that determination of the motion for a preliminary injunction may be made on the existing record.
The City alleges in affidavits that, since The Eclipse obtained its liquor license in August, it “has become a focal point of police attention, requiring the Rochester Police Department to regularly deploy police officers to the Eclipse at closing time to, among other things, assist with the dispersal of large disorderly crowds of patrons.” According to the City, Eclipse patrons “persist in being loud and disorderly, loitering in the streets and sidewalks in the area in and around the club, discharging firearms, and fighting.” The City’s papers contain evidence of only two instances of disorderly conduct which began inside the club (Sept. 27, 1998, Dec. 6, 1998), but several instances of such conduct, including shots fired, outside the club and in nearby streets and sidewalks at closing time. Respondents do not dispute that these incidents, detailed in logs provided by both sides in this litigation, actually occurred, but they dispute the genuineness of the fights which simultaneously broke out on the night of December 5 through 6, 1998, shortly before this application was argued in court, and they believe that they cannot be held liable for incidents which occurred off premises.
The incidents involved quite large crowds and shots fired. The incident on December 6, 1998, which occurred after respondents were served with these motion papers, began with what is alleged to have been serious fighting inside the club. Participants exiting the club warned officers not to enter the club because of an expected “shoot out.” Streets in the area were temporarily closed. Respondents’ privately hired security guards were forced to spray mace inside to quell the fighting.
On prior occasions, three patrons were shot shortly after leaving the club, one resulting in death. The City maintains that the operation of the club thus results “in an unacceptable drain on police resources and the unacceptable risk to the public’s and police officers’ health and safety arising from the *19 fighting and the incidents involving guns being discharged.” The Eclipse operates at a site formerly occupied by another night club, separately owned, which was closed down by the City after similar incidents and the shooting death of a patron by a club security guard. No connection between the prior owner and these respondents is alleged.
Respondents insist, however, that all alleged nuisance activities have occurred a significant distance from the premises, and cannot be used as support for the City’s contention that The Eclipse is a public nuisance. Although respondents acknowledge that an altercation occurred within the premises on the night of December 5 through 6, which spilled out into the streets, they contend that this was a contrived “isolated incident” which cannot, without repeated such instances within or “at the premises”, alone establish a public nuisance. Indeed, respondents contend that the fights at the club that night were staged by individuals who told the owner or his employees that they were offered a reduction of criminal charges then pending against them if they created a serious problem at the club that night. The owner avers in an affidavit that, at approximately 1:25 a.m., about six fights broke out “simultaneously at different locations inside the club”, at least three of which were initiated by patrons who earlier tried without success to bring weapons into the club. According to the owner, prior to that night only two patrons had ever tried to secrete weapons into the club.
Finally, respondents contend that, prior to this, only two serious incidents occurred in front of the club. The first, on August 8, 1998, was instigated after closing time by two men who earlier were denied entrance to the club and who drove up in a mini-van and started a fight on the corner of South Washington and Main Streets. This fight led to a series of fights. The second incident in front of the club occurred on September 26, 1998, at closing time, when a fight broke out between several groups of men which “overwhelmed our club security, and police were forced to utilize pepper spray against several combative persons in order to control the situation.” According to the club owner, “[t]hese were the only incidents which occurred directly in front of our club. The remaining ‘nuisance activities’ alleged by the City all occurred after our security staff had successfully dispersed the crowd from the area in front of the nightclub.” The owner insists that he “obviously cannot control what occurs after patrons are a significant distance from the nightclub and/or are inside of their vehicles”.
*20 Concerning the shootings, respondents contend that the homicide victim was shot three fourths of a mile from the club and that the victim was not a patron. The other two injuries occurred when two cars were stopped at a street light about one-half mile from the club. According to respondents, no arrests have been made other than for occasional disorderly conduct violations unrelated to these more serious incidents. No complaints from citizens have been received. The club operates in a downtown business district otherwise unoccupied during club hours, excepting street and occasional pedestrian traffic.
DISCUSSION
Section 3-15 of the Charter of the City of Rochester, entitled “Abatement of nuisances”, authorizes the Mayor to order the closing of a building to the extent necessary to abate a public nuisance. Public nuisances, as defined in the Charter, exist whenever a sufficient number of violation points have accrued within a specific time period. Points are assessed for violations of the Penal Law and the Municipal Code. Points are also assessed for “permitting the premises to become disorderly, including suffering or permitting fighting or lewdness.” (Charter § 3-15 [B] [3] [d].) Here, the City is not alleging that The Eclipse is a public nuisance as defined in the Charter. Indeed, the City makes no allegation that respondents have violated liquor law statutes or City ordinances.
Instead, the City is alleging the existence of a common-law public nuisance. Section 9-21 of the Charter authorizes the City to maintain such an action. It reads: “Actions may be maintained by the city in courts of competent jurisdiction to restrain the threatened performance of any act contrary to orders, directions or decisions of the Police Chief and Fire Chief and to restrain and abate nuisances.” This provision invokes the common law of public nuisance, because the Charter does not otherwise define the term nuisance. The City is an appropriate party plaintiff (or petitioner) to bring an action to abate a common-law public nuisance. (Nassau Neuropsychiatric Socy. v Adelphi Univ., 18 NY2d 370, 375 [1966]; New York Trap Rock Corp. v Town of Clarkstown, 299 NY 77, 84 [1949]; see also, New York State Natl. Org. for Women v Terry, 886 F2d 1339, 1361 [2d Cir 1989], cert denied 495 US 947 [1990].)
“A public, or as sometimes termed a common, nuisance is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency [citations omitted]. It consists of conduct or omissions which offend, *21 interfere with or cause damage to the public in the exercise of rights common to all [citation omitted], in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons”. (Copart Indus. v Consolidated Edison Co., 41 NY2d 564, 568 [1977].) At least on this motion for a preliminary injunction, the fault of the owner is not an issue (City of New York v Castro, 160 AD2d 651, 652-653 [1st Dept 1990]), and may not thereafter be an issue; if a nuisance be found to exist, respondents are liable “irrespective of negligence or fault.” (State of New York v Shore Realty Corp., 759 F2d 1032, 1051 [2d Cir 1985] [collecting New York cases on the subject]; see, Abrams and Washington, The Misunderstood Law of Public Nuisance: A Comparison with Private Nuisance Twenty Years After Boomer, 54 Alb L Rev 359, 368-369, 370-374 [1990].)
Whether conduct “constitutes a public nuisance must be determined as a question of fact under all the circumstances.” (New York Trap Rock Corp. v Town of Clarkstown, 299 NY, at 80, supra.) “Noise and other disturbances of the peace in a neighborhood have been found to be a public nuisance”. (Hoover v Durkee, 212 AD2d 839, 840 [3d Dept 1995], citing People v Rubenfeld, 254 NY 245 [1930]; see, Matter of Circus Disco v New York State Liq. Auth., 51 NY2d 24, 36 [1980]; State of New York v Waterloo Stock Car Raceway, 96 Misc 2d 350 [Sup Ct, Seneca County 1978]; Town of Mount Pleasant v Van Tassell, 7 Misc 2d 643 [Sup Ct, Westchester County 1957], affd 6 AD2d 880 [2d Dept 1958].) Of course, here, much more than mere noise is alleged to constitute a nuisance.
A review of the evidence submitted shows that the City has established, by clear and convincing evidence, the existence of a nuisance and the necessity for abatement. Congestion of public thoroughfares of the kind proven here, both by affidavit and videotape, coupled with disorderly behavior and frequent shooting of firearms and fighting, constitutes a public nuisance for which a landowner or night club operator may be held liable. (Shaw’s Jewelry Shop v New York Herald Co., 170 App Div 504, 507 [1st Dept 1915], affd 224 NY 731 [1918] [Per Curiam].)[1]
Respondents’ contention that they cannot be held liable in nuisance for off-premises conduct of their (former) patrons is *22 without merit. Although the law is less developed in New York (170 App Div, supra, at 507 [involving large crowds around neighboring premises]; Hamlin v Bender, 92 Misc 16, 26-27 [Sup Ct, Oneida County 1915], affd 173 App Div 996 [4th Dept 1916] [same], discussing Rex v Moore, 3 Barn & Ad [23 Eng C L] 184 [which held a landowner liable in nuisance for crowds gathering outside his grounds to shoot birds escaping from landowner’s pigeon shooting gallery]), the cases are uniform out of State in rejecting arguments of the kind proffered by respondents here. (See, e.g., Sherk v Indiana Waste Sys., 495 NE2d 815, 818 [Ind 1986] [collecting cases] [“a business may be liable for the acts of its customers or others if acts by them upon the business property or in going to or leaving it (constitute a nuisance)”]; Sunset Amusement Co. v Board of Police Commrs., 7 Cal 3d 64, 84, 496 P2d 840, 853 [1972] [“a business catering to the general public may, under certain circumstances, be accountable (in nuisance law) for the disruptive conduct of its patrons, whether on or off the premises”]; Armory Park Neighborhood Assn. v Episcopal Community Servs., 148 Ariz 1, 6-7, 712 P2d 914, 919-920 [1985] [rejecting claims by defendant “that its business should not be held responsible for acts committed by its patrons off the premises” and that “the duty to prevent the harm * * * should be left to the police through regulation of the public streets”].) “Under general tort law, liability for nuisance may be imposed upon one who sets in motion the forces which eventually cause the tortious act; liability will arise for a public nuisance when ‘one person’s acts set in motion a force or chain of events resulting in the invasion.’ ” (148 Ariz, at 7, 712 P2d, at 920, supra, quoting Restatement [Second] of Torts § 824, comment b.) It is the establishment of the night club “which introduced this conduct into the area”, and that is a sufficient connection under applicable law. (Reid v Brodsky, 397 Pa 463, 471, 156 A2d 334, 339 [1959]; Commonwealth v Sal-Mar Amusements, 428 Pa Super 321, 329, 630 A2d 1269, 1273 [1993] [“inquiry into the activities outside the bar is permissible so long as the conduct at issue is in the immediate vicinity of the bar and there is a causal relationship between what occurs inside and outside the premises”].)
“Courts of other states have indicated that one conducting a business or other activity on his premises may be liable for a nuisance if his patrons’ objectionable conduct is shown to have *23 some reasonable relation to the conduct of the business or activity, even though the acts complained of occurred off the premises.” (Packett v Herbert, 237 Va 422, 425-426, 377 SE2d 438, 441-442 [1989] [collecting cases]; see also, Gelletly v Commonwealth, 16 Va App 457, 459-460, 430 SE2d 722, 724 [1993].)
To establish entitlement to a preliminary injunction, the moving party must demonstrate “ ‘(1) a likelihood of ultimate success on the merits; (2) irreparable injury absent the granting of the preliminary injunction; and (3) that a balancing of equities favors [the movant’s] position’ ”. (Barone v Frie, 99 AD2d 129, 132 [2d Dept 1984], quoting Gambar Enters. v Kelly Servs., 69 AD2d 297, 306 [4th Dept 1979]; see, CPLR 6301; Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 [1990]; Doe v Axelrod, 73 NY2d 748, 750 [1988].)[2] “Preliminary injunctive relief is a drastic remedy which will not be granted ‘unless a clear right thereto is established under the law and the undisputed facts upon the moving papers, and the burden of showing an undisputed right rests upon the movant’ ”. (County of Orange v Lockey, 111 AD2d 896, 897 [2d Dept 1985], quoting First Natl. Bank v Highland Hardwoods, 98 AD2d 924, 926 [3d Dept 1983].) All three elements of the test clearly are met here.
Respondents’ contention that their business interests outweigh the need for nuisance abatement is without merit. As stated, fault is not a criterion on these facts. Such cases as People v Cuneo E. Press (257 NY 208 [1931]) and Haber v Paramount Ice Corp. (239 App Div 324 [2d Dept 1933]), which described a “general rule” of fault in cases involving the otherwise lawful conduct of business in a business district, and which rule in any event “varies with the circumstances of each particular case” (239 App Div, supra, at 327), do not compel a different result in a clear case of nuisance threatening the welfare and safety of innocent patrons and the public alike. (See also, People v Markovitz, 102 Misc 2d 575, 577 [Crim Ct, NY County 1979] [common-law “policy of great restraint in dealing with economic interests conducting on-going businesses” gives way when nuisances are “ ‘disorderly’ ” and offend “ ‘public *24 decency' ”].) Given the extent and danger posed by the nuisance here established, respondents’ claim of a “confiscatory deprivation” (102 Misc 2d, at 578) cannot prevail over an established and patent need for abatement. (Hoover v Durkee, 212 AD2d 839, 842-843, supra [balancing called for by Boomer v Atlantic Cement Co., 26 NY2d 219 (1970) is “inapplicable in the context of this public nuisance”]; see generally, Abrams and Washington, op. cit., 54 Alb L Rev 359, 360, 383-384.) The conduct described in the affidavits and depicted on videotape is not an acceptable incident of life in any urban district, business or other nonresidential. (Compare, People v Cuneo E. Press, 257 NY 208 [1931], supra; People v Dayton Cleaners & Dyers Corp., 251 App Div 332 [2d Dept 1937].)
CONCLUSION
The City’s motion for a preliminary injunction is granted. This preliminary injunction does not reach the Erie Professional Building and is directed to The Eclipse and Daniel H. Mackey only.

. Although probably a private nuisance case, the Court was “clearly of the opinion that [the landowner’s] use was * * * an unreasonable interference with the public’s rights in the street”. (Shaw’s Jewelry Shop v New York Herald Co., 170 App Div, supra, at 507.) This is in accord with accepted New *22 York law which recognizes that the gathering of large crowds may “become a public nuisance”. (People v Smith, 259 NY 48, 50 [1932].)

. It has been held that the usual three-pronged test for injunctive relief does not apply where the City of New York seeks to establish a nuisance under the Administrative Code of the City of New York. (City of New York v 56-01 Queens Blvd., 172 Misc 2d 642 [Sup Ct, Queens County 1997] [The City “establishes its entitlement to the injunction simply by proving the illegal conduct during the relevant time period”]; see, City of New York v Bilynn Realty Corp., 118 AD2d 511, 512 [1st Dept 1986].) Here, the City is alleging a common-law nuisance, not a nuisance under the City Charter, and, thus, the three-pronged test does apply.