712 P.2d 914

ARMORY PARK NEIGHBORHOOD AS-
SOCIATION, a non-profit
corporation, Plaintiff/Appellee,

v.

The EPISCOPAL COMMUNITY SER-
VICES IN ARIZONA, a corporation,
dba St. Martin's Center, Defendant/Ap-
pellant.

The EPISCOPAL COMMUNITY SER-
VICES IN ARIZONA, a corporation,
dba St. Martin's Center, Petitioner,

v.

SUPERIOR COURT of the State of Arizo-
na, In and For the COUNTY OF PIMA;
Hon. Harry Gin, a judge thereof; and
Armory Park Neighborhood Associa-
tion, a non-profit corporation, real par-
ty in interest, Respondents.

No. 17980–PR.

Supreme Court of Arizona,
In Banc.

Aug. 29, 1985.

2

Gonzales & Villarreal by Elizabeth C. Peasley, Tucson, for plaintiff/appellee.

Molloy, Jones, Donahue, Trachta & Childers, by Earl F. Daniels III, Tucson, for defendant/appellant.

FELDMAN, Justice.

On December 11, 1982, defendant Episcopal Community Services in Arizona (ECS) opened the St. Martin's Center (Center) in Tucson. The Center's only purpose is to provide one free meal a day to indigent persons. Plaintiff Armory Park Neighborhood Association (APNA) is a non-profit corporation organized for the purpose of "improving, maintaining and insuring the quality of the neighborhood known as Armory Park Historical Residential District." The Center is located on Arizona Avenue, the western boundary of the Armory Park district. On January 10, 1984, APNA filed a complaint in Pima County Superior Court, seeking to enjoin ECS from operating its free food distribution program. The complaint alleged that the Center's activities constituted a public nuisance and that the Armory Park residents had sustained injuries from transient persons attracted to their neighborhood by the Center.

The superior court held a hearing on APNA's application for preliminary injunction on March 6 and 7, 1984. At the commencement of the hearing, the parties stipulated that

... there is no issue concerning any State, County, or Municipal zoning ordi-

nance, or health provision, before the Court. And, the Court may find that defendants are in compliance with the same.

The residents then testified about the changes the Center had brought to their neighborhood. Before the Center opened, the area had been primarily residential with a few small businesses. When the Center began operating in December 1982, many transients crossed the area daily on their way to and from the Center. Although the Center was only open from 5:00 to 6:00 p.m., patrons lined up well before this hour and often lingered in the neighborhood long after finishing their meal. The Center rented an adjacent fenced lot for a waiting area and organized neighborhood cleaning projects, but the trial judge apparently felt these efforts were inadequate to control the activity stemming from the Center. Transients frequently trespassed onto residents' yards, sometimes urinating, defecating, drinking and littering on the residents' property. A few broke into storage areas and unoccupied homes, and some asked residents for handouts. The number of arrests in the area increased dramatically. Many residents were frightened or annoyed by the transients and altered their lifestyles to avoid them.[1]

Following the hearing, ECS filed a motion to dismiss the complaint based on three grounds: 1) that compliance with all applicable zoning and health laws constituted a complete defense to a claim of public nuisance; 2) that there had been no allegation or evidence of a violation of a criminal statute or ordinance, which it argues is a prerequisite to a finding of public nuisance; and 3) that APNA lacked standing to bring an action to abate a public nuisance because it had neither pled nor proved any special injury differing in kind and degree from that suffered by the public generally.

Based on the hearing testimony, the trial court granted the preliminary injunction and denied ECS' motion to dismiss. In its order, the court noted that ECS could be enjoined because its activities constituted both a public and a private nuisance. After its motion for reconsideration was denied, ECS filed a special action[2] in the court of appeals, and shortly thereafter filed a notice of appeal from the order granting the injunction. The court of appeals consolidated the proceedings and stayed enforcement of the trial court's order pending a final decision.

A divided court of appeals reversed the trial court's order. In the view of the majority, a criminal violation was a prerequisite to a finding of public nuisance; because plaintiff had alleged no criminal violation, the injunction was improperly granted. The majority also concluded that the trial court abused its discretion by finding both a public and a private nuisance when the plaintiff had not alleged a private nuisance. Finally, the court held that compliance with zoning provisions was a complete defense. The court vacated the order for preliminary injunction and remanded the matter to the trial court with directions to grant ECS' motion to dismiss. We have jurisdiction pursuant to Rule 23, Ariz.R. Civ.App.P., 17A A.R.S., A.R.S. § 12–120.24, and Rule 8(b), Ariz.R.P.Sp.Act; 17A A.R.S. We granted review in this case because of the importance of the following questions:

1) When does a voluntary association have standing to bring an action for public nuisance on behalf of its members?

2) May a lawful business be enjoined for acts committed off its premises by clients who are not under its control or direction?

3) Is it necessary to plead and prove a zoning or criminal violation by the defendant, or may a lawful activity be enjoined because the manner in which it is conducted is unreasonable and therefore constitutes a public nuisance?

---

**1.** The ultimate findings of the trial court (*see* Rule 65(c), Ariz.R.Civ.P., 16 A.R.S.) are found in its minute entry dated June 8, 1984.

**2.** In Arizona relief by "special action" has replaced the relief previously granted by prerogative writs such as certiorari, mandamus or prohibition. See Rule 1, Ariz.R.Sp.Act., 17A A.R.S.

## THE CONCEPT OF "NUISANCE"

Now considered a tort, a public nuisance action originated in criminal law. Early scholars defined public nuisance as "an act or omission 'which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all her Majesty's subjects.'" PROSSER, W. AND W.P. KEETON, HANDBOOK ON THE LAW OF TORTS, § 90, at 643 (5th ed. 1984), quoting Stephen, General View of the Criminal Law in England 105 (1890). The sole remedy was criminal prosecution. PROSSER, *supra*, § 86, at 618.

■ Historically, the remedy for a private nuisance was an action "upon the case," as it was an injury consequential to the act done and found its roots in civil law. PEARCE, E. AND D. MESTON, HANDBOOK ON THE LAW RELATING TO NUISANCES 2 (1926). A private nuisance is strictly limited to an interference with a person's interest in the enjoyment of real property. The Restatement defines a private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land." RESTATEMENT (SECOND) OF TORTS § 821D. A public nuisance, to the contrary, is not limited to an interference with the use and enjoyment of the plaintiff's land. It encompasses any unreasonable interference with a right common to the general public. RESTATEMENT, *supra*, § 821B. *Accord*, PROSSER, *supra*, § 86, at 618.

We have previously distinguished public and private nuisances. In *City of Phoenix v. Johnson*, 51 Ariz. 115, 75 P.2d 30 (1938), we noted that a nuisance is public when it affects rights of "citizens as a part of the public, while a private nuisance is one which affects a single individual or a definite number of persons in the enjoyment of some private right which is not common to the public." *Id.* at 123, 75 P.2d 34. A public nuisance must also affect a considerable number of people. *Id.* See also *Spur Industries v. Del Webb Development Co.*,

108 Ariz. 178, 494 P.2d 700 (1972). The legislature has adopted a similar requirement for its criminal code, defining a public nuisance as an interference "with the comfortable enjoyment of life or property by an entire community or neighborhood, or by a considerable number of persons . . . ." A.R.S. § 13–2917.[3]

■ The defendant contends that the trial court erred in finding both public and private nuisances when the plaintiff had not asserted a private nuisance claim. The defendant has read the trial court's minute entry too strictly. While we acknowledge that public and private nuisances implicate different interests, we recognize also that the same facts may support claims of both public and private nuisance. As Dean Prosser explained:

> When a public nuisance substantially interferes with the use or enjoyment of the plaintiff's rights in land, it never has been disputed that there is a particular kind of damage, for which the private action will lie. Not only is every plot of land traditionally unique in the eyes of the law, but in the ordinary case the class of landowners in the vicinity of the alleged nuisance will necessarily be a limited one, with an interest obviously different from that of the general public. The interference itself is of course a private nuisance; but is none the less particular damage from a public one, and the action can be maintained upon either basis, or upon both. (Citations omitted.)

Prosser, *Private Action for Public Nuisance*, 52 Va.L.Rev. 997, 1018 (1966).

Thus, a nuisance may be simultaneously public and private when a considerable number of people suffer an interference with their use and enjoyment of land. *See Spur Industries*, 108 Ariz. at 184, 494 P.2d at 706. The torts are not mutually exclusive. Some of plaintiff's members in this case have suffered an injury to the use and enjoyment of their land. Any reference to

---

**3.** This statute was neither raised nor argued by the plaintiff; in fact, the plaintiff expressly de-

nied any statutory violation by the defendant.

both a public and a private nuisance by the trial court was, we believe, merely a recognition of this well-accepted rule and not error. However, both because plaintiff did not seek relief under the theory of private nuisance and because that theory might raise standing issues not addressed by the parties, we believe plaintiff's claim must stand or fall on the public nuisance theory alone.

## STANDING TO BRING THE ACTION

### 1. Do the residents have standing?

 Defendant argues that the Association has no standing to sue and that, therefore, the action should be dismissed. The trial court disagreed and defendant claims it erred in so doing. Two standing questions are before us. The first pertains to the right of a private person, as distinguished from a public official, to bring a suit to enjoin the maintenance of a public nuisance. The original rule at common law was that a citizen had no standing to sue for abatement or suppression of a public nuisance since

> such inconvenient or troublesome offences [sic], as annoy the whole community in general, and not merely some particular persons; and therefore are indictable only, and not actionable; as it would be unreasonable to multiply suits, by giving every man a separate right of action, by what damnifies him in common only with the rest of his fellow subjects.

IV BLACKSTONE COMMENTARIES 167 (1966). It was later held that a private individual might have a tort action to recover personal damages arising from the invasion of the public right. Y.B. 27 Hen. VIII, Mich, pl. 10, *cited in* RESTATEMENT, *supra*, § 821C comment a. However, the individual bringing the action was required to show that his damage was different in kind or quality from that suffered by the public in common. PROSSER, *supra*, § 90, at 646; HARPER & JAMES, THE LAW OF TORTS § 1.23, at 64–5 (1956).

The rationale behind this limitation was two-fold. First, it was meant to relieve defendants and the courts of the multiple actions that might follow if every member of the public were allowed to sue for a common wrong. Second, it was believed that a harm which affected all members of the public equally should be handled by public officials. RESTATEMENT, *supra*, § 821C comment a. *See also Engle v. Clark*, 53 Ariz. 472, 90 P.2d 994 (1939). Considerable disagreement remains over the type of injury which the plaintiff must suffer in order to have standing to bring an action to enjoin a public nuisance. However, we have intimated in the past that an injury to plaintiff's interest in land is sufficient to distinguish plaintiff's injuries from those experienced by the general public and to give the plaintiff-landowner standing to bring the action. *See, e.g., Tucson Community Development and Design Center v. City of Tucson*, 131 Ariz. 454, 457, 641 P.2d 1298, 1302 (1981) (plaintiff denied standing to challenge city's redevelopment plan because they neither lived nor held property in the area affected by the plan); *Folk v. City of Phoenix*, 27 Ariz. App. 146, 551 P.2d 595 (1976) (plaintiff had standing sufficient to withstand a motion to dismiss by alleging ownership of a prescriptive right in the land affected). This seems also to be the general rule accepted in the United States. *See* PROSSER, *supra*, § 90, at 651; RESTATEMENT, *supra*, § 821C comment d.

We hold, therefore, that because the acts allegedly committed by the patrons of the neighborhood center affected the residents' use and enjoyment of their real property, a damage special in nature and different in kind from that experienced by the residents of the city in general, the residents of the neighborhood could bring an action to recover damages for or enjoin the maintenance of a public nuisance.

### 2. May the Association bring the action on behalf of its members?

We have not previously decided whether an association or other organization has standing to assert the claims of its members in a representational capacity. The federal courts, confined by the "case or

controversy" requirements of article III, § 2, cl. 1 of the United States Constitution, have enunciated a three part test. The United States Supreme Court has held that an association has standing to sue on behalf of its members when (a) its members would have standing to sue in their own right; (b) the interests which the association seeks to protect are relevant to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

We have previously determined that the question of standing in Arizona is not a constitutional mandate since we have no counterpart to the "case or controversy" requirement of the federal constitution. *State v. B Bar Enterprises*, 133 Ariz. 99, 649 P.2d 978 (1982). In addressing the question of standing, therefore, we are confronted only with questions of prudential or judicial restraint. *Id.* at 101, 649 P.2d at 980, n. 2. We impose that restraint to insure that our courts do not issue mere advisory opinions, that the case is not moot and that the issues will be fully developed by true adversaries. Our court of appeals has explained that these considerations require at a minimum that each party possess an interest in the outcome. *Chambers v. United Farm Workers Organizing Committee, AFL–CIO*, 25 Ariz.App. 104, 541 P.2d 567 (1975). Thus, the question of standing in Arizona cases such as this need not be determined by rigid adherence to the three-prong test of *Warth*, although those factors may be considered. The issue in *Arizona* is whether, given all the circumstances in the case, the association has a legitimate interest in an actual controversy involving its members and whether judicial economy and administration will be promoted by allowing representational appearance.[4] As indicated earlier, individual residents whose land was affected by the actions of defendant's patrons would have had standing to bring an action in their own name. Testimony was offered indicating that the purpose of APNA was to promote and preserve the use and enjoyment of the neighborhood by its residents. We believe this purpose is sufficiently relevant to the issues presented in this action so that APNA will adequately and fairly represent the interests of those of its members who would have had standing in their individual capacities. *1,000 Friends of Oregon v. Multnomah County, Land Conservation and Development Commission*, 39 Or.App. 917, 593 P.2d 1171 (1979). Further, APNA seeks an injunction rather than damages for separate property owners. Principles of judicial economy are advanced by allowing the issues to be settled in a single action rather than in a multitude of individual actions because the relief sought is universal to all of its members and requires no individual quantification by the court. We hold, therefore, that APNA has standing to bring the action as the representative of its members.

## DEFENDANT'S DERIVATIVE RESPONSIBILITY

Defendant claims that its business should not be held responsible for acts com-

---

**4.** Considerable controversy exists with respect to whether a litigant has standing to sue in federal court absent a showing of a personal, particularized injury. These cases involve, for the most part, litigation over the government's alleged violation of constitutional or statutory rights possessed by the public in general. *See,* Powell, *Sitting and Standing in the Supreme Court: Warth and the Problem of Distributive Justice*, 33 DePaul L. Rev. 429 (1984). The battle between "minimalists" and "prudentialists" involves surface issues tied to the case or controversy requirements and deep-rooted philosophical problems involving the role of the federal judiciary. *Id.; See, also, Phillips Petroleum Co. v. Shutts*, —— U.S. ——, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). We do not believe these considerations are relevant to the case at bench because the plaintiff's members have shown a particularized injury—a dispute involving the interference with the use of land. We do not reach, therefore, the issue of whether a private citizen who has sustained no particularized or unique injury has standing to bring an action against the government for its alleged violation of constitutional or statutory rights of others.

mitted by its patrons off the premises of the Center. It argues that since it has no control over the patrons when they are not on the Center's premises, it cannot be enjoined because of their acts. We do not believe this position is supported either by precedent or theory.

In *Shamhart v. Morrison Cafeteria Co.*, 159 Fla. 629, 32 So.2d 727 (1947), the defendant operated a well frequented cafeteria. Each day customers waiting to enter the business would line up on the sidewalk, blocking the entrances to the neighboring establishments. The dissenting justices argued that the defendant had not actually caused the lines to form and that the duty to prevent the harm to the plaintiffs should be left to the police through regulation of the public streets. The majority of the court rejected this argument, and remanded the case for a determination of the damages. *See, also, Reid v. Brodsky*, 397 Pa. 463, 156 A.2d 334 (1959) (operation of a bar enjoined because its patrons were often noisy and intoxicated; they frequently used the neighboring properties for toilet purposes and sexual misconduct); *Barrett v. Lopez*, 57 N.M. 697, 262 P.2d 981, 983 (1953) (operation of a dance hall enjoined, the court finding that "mere possibility of relief from another source [police] does not relieve the courts of their responsibilities"); *Wade v. Fuller*, 12 Utah 2d 299, 365 P.2d 802 (1961) (operation of drive-in cafe enjoined where patrons created disturbances to nearby residents); *McQuade v. Tucson Tiller Apartments*, 25 Ariz.App. 312, 543 P.2d 150 (1975) (music concerts at mall designed to attract customers enjoined because of increased crowds and noise in residential area).

 Under general tort law, liability for nuisance may be imposed upon one who sets in motion the forces which eventually cause the tortious act; liability will arise for a public nuisance when "one person's acts set in motion a force or chain of events resulting in the invasion." RESTATE-MENT, *supra*, § 824 comment b. We hold, therefore, that defendant's activity may be enjoined upon the showing of a causal con-nection between that activity and harm to another.

The testimony at the hearing establishes that it was the Center's act of offering free meals which "set in motion" the forces resulting in the injuries to the Armory Park residents. Several residents testified that they saw many of the same transients passing through the neighborhood and going in and out of the Center. We find the testimony sufficient to support the trial judge's finding of a causal link between the acts of ECS and the injuries suffered by the Armory Park residents. The court of appeals thus erred by holding that there was no evidence from which the trial court could have concluded that ECS had engaged in conduct which would render it causally responsible for the interferences. The question is not whether defendant directly caused each improper act, but whether defendant's business operation frequently attracted patrons whose conduct violated the rights of residents to peacefully use and enjoy their property.

## REASONABLENESS OF THE INTERFERENCES

 Since the rules of a civilized society require us to tolerate our neighbors, the law requires our neighbors to keep their activities within the limits of what is tolerable by a reasonable person. However, what is reasonably tolerable must be tolerated; not all interferences with public rights are public nuisances. As Dean Prosser explains, "[t]he law does not concern itself with trifles, or seek to remedy all of the petty annoyances and disturbances of everyday life in a civilized community even from conduct committed with knowledge that annoyance and inconvenience will result." PROSSER, *supra*, § 88, at 626. Thus, to constitute a nuisance, the complained-of interference must be substantial, intentional and unreasonable under the circumstances. RESTATEMENT, *supra*, § 826 comment c and § 821F. Our courts have generally used a balancing test in deciding the reasonableness of an interference. *See McQuade v. Tucson Tiller*

*Apartments, supra.* The trial court should look at the utility and reasonableness of the conduct and balance these factors against the extent of harm inflicted and the nature of the affected neighborhood. We noted in the early case of *MacDonald v. Perry:*

What might amount to a serious nuisance in one locality by reason of the density of the population, or character of the neighborhood affected, may in another place and under different surroundings be deemed proper and unobjectionable. What amount of annoyance or inconvenience caused by others in the lawful use of their property will constitute a nuisance depends upon varying circumstances and cannot be precisely defined.

32 Ariz. 39, 50, 255 P. 494 (1927). *See, also, Spur Industries, supra.*

■ The trial judge did not ignore the balancing test and was well aware of the social utility of defendant's operation. His words are illuminating:

It is distressing to this Court that an activity such as defendants [sic] should be restrained. Providing for the poor and the homeless is certainly a worthwhile, praisworthy [sic] activity. It is particularly distressing to this Court because it [defendant] has no control over those who are attracted to the kitchen while they are either coming or leaving the premises. However, the right to the comfortable enjoyment of one's property is something that another's activities should not affect, the harm being suffered by the Armory Park Neighborhood and the residents therein is irreparable and substantial, for which they have no adequate legal remedy.

Minute Entry, 6/8/84, at 8. We believe that a determination made by weighing and balancing conflicting interests or principles is truly one which lies within the discretion of the trial judge. *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208 (1983). We defer to that discretion here. The evidence of the multiple trespasses upon and defacement of the residents' property supports the trial court's conclusion that the interference caused by defendant's operation was unreasonable despite its charitable cause.

The common law has long recognized that the usefulness of a particular activity may outweigh the inconveniences, discomforts and changes it causes some persons to suffer. We, too, acknowledge the social value of the Center. Its charitable purpose, that of feeding the hungry, is entitled to greater deference than pursuits of lesser intrinsic value. It appears from the record that ECS purposes in operating the Center were entirely admirable. However, even admirable ventures may cause unreasonable interferences. *See e.g., Assembly of God Church of Tahoka v. Bradley,* 196 S.W.2d 696 (Tex.Civ.App.1946). We do not believe that the law allows the costs of a charitable enterprise to be visited in their entirety upon the residents of a single neighborhood. The problems of dealing with the unemployed, the homeless and the mentally ill are also matters of community or governmental responsibility.

## ZONING

■ ECS argues that its compliance with City of Tucson zoning regulations is a conclusive determination of reasonableness. We agree that compliance with zoning provisions has some bearing in nuisance cases. We would hesitate to find a public nuisance, if, for example, the legislature enacted comprehensive and specific laws concerning the manner in which a particular activity was to be carried out. *Accord* RESTATEMENT, *supra,* § 821B comment f. We decline, however, to find that ECS' compliance with the applicable zoning provisions precludes a court from enjoining its activities. The equitable power of the judiciary exists independent of statute. Although zoning and criminal provisions are binding with respect to the type of activity, they do not limit the power of a court acting in equity to enjoin an unreasonable, albeit permitted, activity as a public nuisance. *Accord State ex rel. Carlson v. Hatfield,* 183 Neb. 157, 158 N.W.2d 612

(1968); *Monroe City v. Arnold*, 22 Utah 2d 291, 452 P.2d 321 (1969).

The determination of the type of business to be permitted in a particular neighborhood, therefore, may be left to administrative agencies or legislative bodies. However, the judgment concerning the manner in which that business is carried out is within the province of the judiciary. RESTATEMENT, *supra*, § 821B comment f. *See also* J. JOYCE, TREATISE ON THE LAW GOVERNING NUISANCES § 73, at 115 (1906). Zoning provisions may permit one's neighbor to operate a business. This does not give him license to use one's yard, nor permit his customers to do so.

In so far as *Desruisseau v. Isley*, 27 Ariz.App. 257, 553 P.2d 1242 (1976) is contrary to this principle, it is disapproved.

## CRIMINAL VIOLATION

Occasionally we have indicated that conduct which violates a specific criminal statute is an element of public nuisance for civil tort claims. *See, e.g., State v. B Bar Enterprises, Inc., supra; Spur Industries, supra; State ex rel. Sullivan v. Phoenix Savings Bank & Trust Co.*, 68 Ariz. 42, 198 P.2d 1018 (1948); *MacDonald v. Perry, supra; Cactus Corp. v. State ex rel. Murphy*, 14 Ariz.App. 38, 480 P.2d 375 (1971). These cases did not face the issue whether a tort claim for public nuisance exists independent of statute. ECS argued that there is no criminal violation and that a tort claim for nuisance must be based on such a violation. The trial court did find that the consequences of ECS' activities fit within A.R.S. § 13–2917, which defines a criminal nuisance as an interference with the "comfortable enjoyment of life or property." We need not reach this issue nor need we rule on the constitutionality of the statute. We do not find it fatal that the plaintiff failed to allege a statutory violation. The statute in question adds little to APNA's claim. It does not proscribe specific conduct nor define what conduct constitutes a public nuisance, but only declares, in effect, that a public nuisance is a crime. We are squarely faced, therefore, with the issue of whether a public nuisance may be found in the absence of a statute making specific conduct a crime.

In *MacDonald v. Perry, supra,* we indicated that the inquiry in a nuisance claim is not whether the activity allegedly constituting the nuisance is lawful but whether it is reasonable under the circumstances. The Restatement states that a criminal violation is only one factor among others to be used in determining reasonableness. That section reads:

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, *or*

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, *or*

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right. (*Emphasis supplied.*)

RESTATEMENT, *supra*, § 821B. Comment d to that section explains:

It has been stated with some frequency that a public nuisance is always a criminal offense. This statement is susceptible of two interpretations. The first is that in order to be treated as a public nuisance, conduct must have been already proscribed by the state as criminal. This is too restrictive.... [T]here is clear recognition that a defendant need not be subject to criminal responsibility.

RESTATEMENT, *supra*, § 821B comment d, at 89.

Our earlier decisions indicate that a business which is lawful may nevertheless be a public nuisance. For example, in *Spur Industries, supra,* we enjoined the defendant's lawful business. We explained that "Spur is required to move not because of any wrongdoing on the part of Spur, but because of a proper and legitimate regard of the courts for the rights and interests of the public." 108 Ariz. at 186, 494 P.2d at 708. *See also City of Phoenix v. Harlan,* 75 Ariz. 290, 255 P.2d 609 (1953). This rule is widely accepted. JOYCE, *supra,* § 99 at 146; HARPER AND JAMES, § 1.30 at 90.

We hold, therefore, that conduct which unreasonably and significantly interferes with the public health, safety, peace, comfort or convenience is a public nuisance within the concept of tort law, even if that conduct is not specifically prohibited by the criminal law.

### COSTS

Pursuant to Rule 21(d), the court of appeals awarded costs in the amount of $1,003.50 to ECS. Given the charitable nature of ECS' activities and the unique questions presented in this dispute, we feel it is inappropriate to payment of litigation costs of ECS. Consequently, we order each side to bear its own costs of appeal.

### CONCLUSION

The trial court's order granting the preliminary injunction is affirmed. By affirming the trial court's preliminary orders, we do not require that he close the center permanently. It is of course, within the equitable discretion of the trial court to fashion a less severe remedy, if possible. The opinion of the court of appeals is vacated. The case is remanded for further proceedings.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.