IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

FREDDY BROWN, et al., *Plaintiffs/Appellees,*

*v.*

CITY OF PHOENIX, *Defendant/Appellant.*

Nos. 1 CA-CV 23-0273, 1 CA-CV 23-0689
(Consolidated)

FILED 08-27-2024

Appeal from the Superior Court in Maricopa County
No.  CV2022-010439
The Honorable Scott A. Blaney, Judge

**AFFIRMED AS CLARIFIED**

COUNSEL

Pierce Coleman PLLC, Scottsdale
By Justin S. Pierce, Aaron D. Arnson, Trish Stuhan, Stephen B. Coleman
*Counsel for Defendant/Appellant*

Tully Bailey LLP, Phoenix
By Ilan Wurman, Stephen W. Tully, Michael Bailey
*Counsel for Plaintiffs/Appellees*

**OPINION**

Presiding Judge Samuel A. Thumma delivered the opinion of the Court, in
which Judge Jennifer B. Campbell and Judge Michael J. Brown joined.

**T H U M M A**, Judge:

¶1 These consolidated appeals turn on whether the superior court properly required the City of Phoenix to clear homeless encampments on land the City owns in an area called "the Zone." Resolution of this appeal implicates whether the City "created and maintained a public nuisance" in the Zone, whether the court's injunction exceeds the limits of mandamus relief and other issues. For the reasons below, the permanent injunction is affirmed as clarified.

## FACTS AND PROCEDURAL HISTORY

¶2 For decades, the City of Phoenix has struggled with homelessness. During recent times, the number of homeless people has exceeded the number of beds available in shelters, leaving little (and at times no) capacity to accommodate those seeking shelter. The issue becomes particularly acute in the summer, where temperatures can exceed 115 degrees Fahrenheit, and often exceed 110 degrees Fahrenheit for days at a time.

¶3 One of the approaches to address homelessness the City has attempted is a Human Services Campus (HSC), established in 2005. At the HSC, centered roughly at 12th Avenue and Madison Street, non-profit groups provide various services to homeless people, including shelter, food, health care and workforce development. The HSC is surrounded by residences, industrial and commercial businesses, as well as Library Park and Pioneer & Military Memorial Park, all bounded on the south by railroad tracks.

¶4 For years, these groups apparently provided services to homeless people without significant incident or interference with neighbors' properties. That began to change in 2020, perhaps because of the COVID-19 pandemic. According to one estimate, by early 2023, the number of homeless people in need of shelter in the City increased by nearly 50 percent compared to just a few years earlier. Of the more than 3,300 estimated homeless people in the City in early 2023, as many as 1,000 were living in the Zone.

¶5 The Zone is variously described as land: (1) from 7th to 15th Avenues from Van Buren and Grant Streets; (2) from 9th to 13th Avenues from Jefferson Street to the railroad tracks on the south or (3) along Jefferson, Madison and Jackson Streets from 8th to 13th Avenues. Although the permanent injunction did not define the boundaries of the Zone, at oral

argument before this court, the City admitted that the boundaries of the Zone were "not disputed." The Zone includes property owned by: (1) the City; (2) other public entities; (3) nonprofit groups and (4) by private individuals and companies.

¶6  By August 2022, the Zone -- the northwest corner of which is located across the intersection from where this Court is located -- had become the largest homeless encampment in Arizona. As alleged by Plaintiffs, who are property owners, or lease property or live in or near the Zone, the conditions were intolerable:

> In the Zone and its environs, laws are violated with impunity; residents are subject to violence, property damage, and other criminal and civil violations of laws designed to protect the quality of life of residents; property values have been erased; trash and human waste litter streets and yards; and, most tragically, a great humanitarian crisis unfolds as homeless residents of the Zone die on a daily basis.

In August 2022, Plaintiffs filed this case seeking declaratory, special action, and injunctive relief, naming the City as the sole defendant. Plaintiffs' detailed complaint asserted five causes of action seeking: (1) a judgment "declaring the Zone to be a public nuisance;" (2) a declaration that "the City's actions" deprived Plaintiffs of their liberty and property rights without due process of law in violation of Article 2, Section 4, of the Arizona Constitution; (3) a declaration that "the City's actions" had deprived Plaintiffs of their privileges and immunities in violation of Article 2, Section 13, of the Arizona Constitution; (4) special action and mandamus relief "declaring the Zone, and the City's actions in and relating to the Zone, to be a public nuisance; declaring the City's refusal to supply protection of the laws to be unconstitutional; and ordering [the City] to abate the nuisance" and (5) preliminary and permanent injunctions directing the City "to refrain from expanding, maintaining, and/or operating its public nuisance, and directing [the City] immediately to abate the nuisance."

¶7  Plaintiffs also applied for a preliminary injunction: (1) barring the City from expanding the Zone "by directing more homeless persons there;" (2) ordering the City to mitigate the nuisance "by supplying sufficient police and other services to enforce prohibitions on drug use and other disorderly conduct, as well as public urination, defecation and trespass that routinely occur on Plaintiffs' private properties" and (3)

ordering the City "immediately to abate the nuisance," including "with strict enforcement of prohibitions on public camping, and/or by moving the homeless to an area where no nuisance risk exists, or by some other sufficient and appropriate method."

¶8            The court held an evidentiary hearing in October 2022, resulting in a judicial recusal and reassignment to a new judge. After considering the record, briefing and oral arguments, the new judge issued a detailed minute entry granting Plaintiff's request for a preliminary injunction. That minute entry stated the City: (1) "is prohibited from continuing to maintain a public nuisance on the public property in the Zone;" (2) "shall abate the nuisance it presently maintains on the public property in the Zone;" (3) "shall maintain its public property in the Zone in a condition free of (a) tents and other makeshift structures in the public rights of way; (b) biohazardous materials including human feces and urine, drug paraphernalia, and other trash; and (c) individuals committing offenses against the public order;" (4) "shall devise and carry out as soon as is practicable a plan that achieves compliance with this Order;" (5) is enjoined "from further, arbitrary enforcement" of a Phoenix City Code Section "regarding the artistic sculptures Phoenix Kitchens installed next to its building," ordering that the sculptures "shall remain in place" until the City abated the public nuisance or further court order and (6) must "be prepared to demonstrate" compliance efforts and results at a July 2023 merits trial, recognizing the parties did not seek to or otherwise agree to consolidate the hearing on the preliminary injunction with a trial on the merits. *See* Ariz. R. Civ. P. 65(a)(2)(A)(2024).[1] The City timely appealed from the preliminary injunction.

¶9            In July 2023, the court held a two-day bench trial on the causes of action alleged in the complaint. In September 2023, the court issued a detailed minute entry that, based on many of the same facts and adopting the findings and analysis from the preliminary injunction ruling, found that Plaintiffs were entitled to a permanent injunction and mandamus relief. The minute entry detailed findings of fact on the conditions in the Zone, providing descriptions of drug use, prostitution, violent crime and open fires. The court found that individuals working in the Zone had been "violently attacked," "multiple homicides" had been committed "in the weeks leading up to trial," and law enforcement had responded several times to reports of "burned or burning human bodies in the Zone." These

---

[1] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

facts led the court to declare that the City "has created and maintained a public nuisance in the area known as the 'Zone' since as early as 2019."

¶10     The relief granted in the permanent injunction was substantially similar to the preliminary injunction relief described above in paragraph 8. The court ordered the City to "abate the nuisance it presently maintains on the public property in the Zone, including the removal of all tents and other makeshift structures, by November 4, 2023." It also ordered the City to "maintain its public property in the Zone in a condition free of" tents, biohazardous materials and "individuals committing offenses against the public order." Although stating Plaintiffs' constitutional claims were "potentially viable," the court declined to address them given Plaintiffs had obtained relief based on non-constitutional grounds. The City timely appealed from the permanent injunction.

¶11     On November 20, 2023, the superior court issued a Rule 54(c) final judgment, also awarding Plaintiffs $214,960.50 in attorneys' fees and $6,124.03 in taxable costs pursuant to A.R.S. §§ 12-348 and 12-2030 as well as the "private attorney general" doctrine. *See Ansley v. Banner Health Network*, 248 Ariz. 143, 152-53 (2020). The City timely appealed from the final judgment.

¶12     This court consolidated the appeals. This court has jurisdiction over the City's timely appeals pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) sections 12-120.21(A)(1) and -2101(A)(1) and (5)(b).

## DISCUSSION

¶13     The City does not challenge the superior court's findings that the conditions in the Zone constituted a "public nuisance[] dangerous to the public health." *See* A.R.S. § 36-601(A)(1), (2), (5), (9); *see also* A.R.S. § 13-2917(A)(2) (unlawfully obstructing free passage or use of "any public park, square, street or highway" is a public nuisance that may constitute a class 2 misdemeanor); *Spur Indus., Inc. v. Del E. Webb Dev. Co.*, 108 Ariz. 178, 183 (1972) (noting a common law "public nuisance is one affecting the rights enjoyed by citizens as a part of the public;" it must "affect a considerable number of people") (citing *City of Phoenix v. Johnson*, 51 Ariz. 115 (1938)).

¶14     The superior court's findings of fact, in granting the preliminary and permanent injunctions, support that conclusion and are supported by the record. The City does not argue to the contrary. Instead, the issues on appeal focus on whether the superior court properly applied

the substantive law. The court addresses these issues in turn, starting with whether the permanent injunction is moot.

## I.     The Permanent Injunction Is Not Moot.

¶15     The relief granted in the permanent injunction was substantially similar to the preliminary injunction relief, although with some different compliance and other dates. Accordingly, the court addresses the arguments of the parties as they apply to the permanent injunction. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 314 (1999) ("[A]n appeal from the grant of a preliminary injunction becomes moot when the trial court enters a permanent injunction, because the former merges into the latter.").

¶16     At oral argument before this court, both parties stated that the permanent injunction is not moot. Although the parties agree that the City has largely complied with orders to abate the public nuisance, the permanent injunction imposes ongoing obligations on the City to "maintain its public property in the Zone in a condition free of" tents, biohazardous materials and "individuals committing offenses against the public order." Because the conditions amounting to a public nuisance may reoccur, the permanent injunction is not moot. *See Modular Mining Sys., Inc. v. Jigsaw Techs., Inc.*, 221 Ariz. 515, 519 ¶ 12 (App. 2009) (citing cases) ("The issue of injunctive relief is moot when the 'events make it absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'").

## II.    The Standard Under Arizona Law for a Permanent Injunction.

¶17     "Injunctive relief is available only when the injury is 'not remediable by damages.'" *City of Flagstaff v. Ariz. Dept. of Admin.*, 255 Ariz. 7, 13 ¶ 18 (App. 2023) (quoting *Shoen v. Shoen*, 167 Ariz. 58, 63 (App. 1990)). Although there is substantial Arizona law addressing the preliminary injunction standard, there is comparatively little law addressing the equitable remedy of a permanent injunction. Building on preliminary injunction law where applicable, the standard for a party to obtain a permanent injunction under Arizona law requires a showing that: (1) the plaintiff prevailed on the merits; (2) damages will not provide an adequate remedy; (3) the balance of hardships favors the plaintiff and (4) public policy favors the permanent injunction. *Cf. City of Flagstaff*, 255 Ariz. at 13 ¶

18 (preliminary injunction standard); *Shoen*, 167 Ariz. at 63 (same).[2] A superior court's decision to grant an injunction will be upheld unless the court "erred in finding the facts or applying them to the [law] for granting an injunction." *Shoen*, 167 Ariz. at 62.

¶18        The permanent injunction, by obligating the City to act (rather than prohibiting it from acting), is properly called a mandatory injunction. As noted by one compendium, a mandatory injunction "should be granted only in cases of great necessity or under compelling circumstances, such as where extreme or serious damage would result absent the relief, and is not issued in doubtful cases." 42 AM. JUR. 2D INJUNCTIONS § 6 MANDATORY INJUNCTIONS (May 2024 Update) (footnotes and citations omitted). This same source notes that a request for a mandatory injunction should be denied "unless the facts and law clearly favor the moving party," adding, however, that "[m]andatory injunctions are commonly issued to compel, among other things, the removal or abatement of nuisances." *Id.* (footnote and citation omitted). With this background, the court turns to the City's arguments that the permanent injunction was error because the City did not cause the public nuisance.

### III.    The Permanent Injunction Is Affirmed as Clarified.

#### A.    The Record Does Not Show That "Courtesy Rides" to Homeless Individuals so that They Could Obtain Services in The Zone "Created or Maintained" a Public Nuisance.

¶19        In concluding the City "created and/or is maintaining the alleged nuisance in the Zone," the permanent injunction stated that "[m]ost notably, the City and its funded partners transport homeless individuals from other parts of Phoenix into the Zone so that they can receive services" from the various entities at HSC. This is an apparent reference to "courtesy rides" by Phoenix Police Officers to ensure that homeless individuals received needed services at HSC. The permanent injunction added that "[t]here is no evidence that the City transports these homeless individuals

---

[2] The court rejects Plaintiffs' reliance on *Burton v. Celentano*, 134 Ariz. 594 (App. 1982) for the proposition that they need not show damages fail to provide an adequate remedy or that the balance of hardships favors them in assessing the permanent injunction. *Burton* applied a statute authorizing preliminary injunctive relief in a dispute between private parties in a nuisance case involving the Floodplain Management Act. 134 Ariz. at 594-97. There is no such statutory basis for the permanent injunctive relief at issue there.

back out of the Zone after they meet with Campus providers and thus they are left in the Zone." The permanent injunction then found that these rides to HSC "inevitably result in more homeless individuals residing on the streets of the Zone."

¶20        There is no record evidence that people transported to the Zone after receiving "courtesy rides" remained in the Zone. The record does not indicate when HSC services for individuals who received "courtesy rides" would end. From the record, it is unclear where such individuals, who were homeless when they received "courtesy rides," should be transported to after receiving HSC services. Nor did Plaintiffs show that transporting such individuals after they received services would be a law enforcement function.

¶21        Even if the individuals provided "courtesy rides" to receive services stayed in the Zone, the evidence suggests police officers provided these "courtesy rides" perhaps five times a year. Given Plaintiffs' assertion that the Zone began expanding in 2019, that would mean police officers would have given "courtesy rides" to about 20 people to the Zone through the time of the preliminary injunction. The record does not show that the addition of 20 people, over four years, converted the Zone into a public nuisance. Applying the standard for public nuisance liability set forth by the Arizona Supreme Court, City police officers providing these limited number of "courtesy rides" to (but not back from) the Zone failed to "set[] in motion the forces which eventually cause the tortious act." *Armory Park v. Episcopal Comm. Servs. in Ariz.*, 148 Ariz. 1, 7 (1985). Thus, the "courtesy rides" did not result in the City having "created and . . . maintain[ed] a public nuisance in the Zone."

### B.    The Mandatory Injunction Properly Required the City to Abate the Nuisance on Property the City Owns and Controls in the Zone.

¶22        The City argues it did not cause or maintain the public nuisance in the Zone. As noted in *Armory Park*, causation is an essential element of a public nuisance claim. 148 Ariz. at 7. The City argues it cannot be held liable for a public nuisance "caused by third-party actions beyond the City's control."

¶23        To the extent the City presses this argument for property it owns and controls in the Zone, the argument fails. The City properly may be held responsible both for a public nuisance, and to abate a public nuisance, on land it owns and controls. In requiring such abatement, the

superior court properly relied on *Phoenix v. Johnson*, 51 Ariz. 115 (1938). Applying Arizona's common law, *Johnson* addressed a sewer system the City built and installed that the City then failed to operate properly, resulting in the emission of foul odors. 51 Ariz. at 120. In addressing resulting claims, the court approved a jury instruction allowing the City to be held liable for failing to manage its sewer system, thereby causing a public nuisance. *Id.* at 130. That same analysis applies here.

¶24        "[O]ne who owns land and fails to act to abate a [public] nuisance originating on that land" can be held liable under a public nuisance theory. *Bischofshausen v. Pinal-Gila Ctys. Air Quality Control Dist.*, 138 Ariz. 109, 112 (App. 1983) (citing RESTATEMENT (SECOND) OF TORTS §§ 824, 838-840 (Am. Law. Inst. 1979)). Though not expressly stated in the permanent injunction, the parties acknowledged at oral argument in this court that the "public property" reference in the permanent injunction is limited to public property the City owns and controls and does not apply to public property owned and controlled by another public entity or property owned by private individuals or entities.

¶25        The City conceded at oral argument that it has the same obligations as a private landowner to maintain property it owns and controls free of nuisances. The common law provides that, when a landowner "knows or has reason to know that the nuisance is resulting or likely to result, [the landowner] is under a duty to exercise reasonable care to prevent it." RESTATEMENT (SECOND) OF TORTS § 838(g) (Am. Law. Inst. 1979). Of course, "reasonable care" depends on the circumstances. *Id.* The Restatement provides that "when the nuisance can be prevented only by measures involving great effort and expense and in proportion the harm caused by the nuisance is relatively slight, the possessor is not liable if [the possessor] fails to adopt the measures to prevent it." *Id.* The evidence here, however, allowed the superior court to conclude that harm caused by the public nuisance in the Zone was more than "relatively slight." The evidence shows the City's public property in the Zone was the site of, among other things, persistent violence, drug use, other crime, human waste and litter. The City, to be sure, has shown that great expense and effort has gone into abating the public nuisance in the Zone. Yet in analyzing the City's responsibility to abate a public nuisance arising from property it owns and controls, *Johnson* found that the "expense may be great, and the vigilance required in the operation and maintenance may be incessant, but modern science teaches us that human care and ingenuity is sufficient to the situation." 51 Ariz. at 126.

¶26        Along with these common law principles, the City concedes that it is governed by A.R.S. § 9-240. Under that statute, the City "shall also have power . . . [t]o exercise exclusive control over the streets, alleys, avenues and sidewalks." A.R.S. § 9-240(A)(3). The City also admits that it has control over its rights of way. Although arising in a different context, the City is responsible for keeping its streets, alleys, avenues and sidewalks reasonably safe. *See Beach v. City of Phoenix*, 136 Ariz. 601, 603 (1983). The evidence received by the superior court showed that the tents and other structures in the Zone blocked rights of way and portions of the streets, which also blocked traffic. While the City is correct in noting third parties created these obstructions, the superior court did not err in finding the City was responsible for abating a public nuisance on property that the City owns and controls. *See Armory Park*, 148 Ariz. at 7; *Johnson*, 51 Ariz. at 130; *see also Bischofshausen*, 138 Ariz. at 112.[3]

### C.     The Mandatory Injunction, as Clarified, Is Sufficiently Specific.

¶27        "Every order granting an injunction" must, among other things, "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Ariz. R. Civ. P. 65(d). An injunction must be "neither too broad to be warranted by the facts, nor too narrow to protect the interests involved. It must set forth the prohibited activity with specificity so that the person or persons enjoined know exactly what is prohibited." *Evenson v. Ortega*, 605 F. Supp. 1115, 1121 (D. Ariz. 1985). An injunction must be "tailored to eliminate only the specific harm alleged." *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012). This court reviews an injunction for an abuse of discretion, *Kromko v. City of Tucson*, 202 Ariz. 499, 501 ¶ 4 (App. 2002), recognizing an overbroad

---

[3] The superior court correctly noted that *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019) and *Johnson v. City of Grants Pass*, 72 F.4th 868 (9th Cir. 2023), *reversed, City of Grants Pass v. Johnson*, No. 23-175, 603 U.S. __ (slip op. June 28, 2024) are not binding here. Given this opinion addresses Arizona's statutory and common law, this court need not (and expressly does not) address those decisions. Similarly, the City's supplemental citation to the unpublished state trial court decision in *Barrani v. Salt Lake City*, No. 230907360 (Utah Third Judicial Dist. Mar. 27, 2024) is not binding, *see* Ariz. R. Sup. Ct. 111(d), 111(c)(1)(C), involved claims different than those made by Plaintiffs here and applies Utah law that differs from the Arizona law applicable here.

injunction is an abuse of discretion, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009).

¶28 The permanent injunction requires the City to "abate the nuisance it presently maintains on the public property in the Zone, including the removal of all tents and other makeshift structures." The permanent injunction, however, does not define "public property," only referring to "public sidewalks, public grounds, and public rights of way." Along with public property owned and controlled by the City, the Zone apparently includes property owned by other public entities; by private individuals or entities and by private nonprofit entities. As noted above, however, at oral argument before this court, the parties acknowledged that the "public property" reference in the permanent injunction is limited to public property the City owns and controls and does not apply to public property owned and controlled by other public entities or property owned by private individuals or entities.

¶29 While the City properly may be ordered to abate any public nuisance on property the City owns and controls, *see Armory Park*, 148 Ariz. at 7; *Johnson*, 51 Ariz. at 130, that is not true for property that the City does not own or control. Indeed, the Phoenix City Code requires owners, lessees and others controlling land not owned by the City to keep their land clear. *See* Phoenix City Code § 31-10(A) ("*The owner, lessee or other person in control of any land abutting a sidewalk, alley, or street shall* maintain such sidewalk, alley, or street on which such land abuts in a clean condition in such a manner as to be free from: 1. Litter, garbage, debris, rubble; 2. Insect and rodent infestation; 3. Overgrown vegetation, dead trees, brush, and weeds; and 4. Other conditions that present a health, fire or safety hazard.") (emphasis added).

¶30 Stated simply, the City must abate the public nuisance on land it owns and controls in the Zone, but not land in the Zone owned or controlled by others. Because an injunction is not automatically void for lack of specificity, *State v. Nettz*, 114 Ariz. 296, 299 (App. 1977), this court affirms the permanent injunction with the clarification that the "public property" referred to is limited to public property in the Zone that the City owns and controls. *Cf. Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 887 (9th Cir. 2007) (narrowing scope of preliminary injunction, while also remanding).

### D.    Other Arguments by the City Do Not Change the Outcome.

**¶31**        The City argues the permanent injunction violates the political question doctrine and exceeds the limits of mandamus, that the City is entitled to absolute immunity under A.R.S. § 12-820.01 and that Plaintiffs failed to establish the equitable factors necessary for a permanent injunction. Each of these arguments fails.

**¶32**        "The political question doctrine provides that a dispute is a nonjusticiable political question if there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Puente v. Ariz. State Legislature*, 254 Ariz. 265, 268 ¶ 7 (2022) (quoting *Kromko v. Ariz. Bd. of Regents*, 216 Ariz. 190, 192 ¶ 11 (2007)). For more than 85 years, Arizona's courts have recognized the authority to hold municipalities responsible for public nuisances on land they own and control under Arizona law. *See Johnson*, 51 Ariz. at 130. The City has not shown that doing so here is beyond the authority of the judiciary, or that responsibility for a public nuisance lacks discoverable and manageable standards for judicial resolution.

**¶33**        For similar reasons, for the public property the City owns and controls in the Zone, the City's argument that the permanent injunction (requiring the City to act) exceeds the limits of mandamus relief fails. *See Sears v. Hull*, 192 Ariz. 65, 68 ¶ 11 (Ariz. 1998) (noting "mandamus [action] will only lie 'to require public officers to perform their official duties when they refuse to act,' and not 'to restrain a public official from doing an act'"). Citing A.R.S. § 12-820.01, the City argues that it is "immune for decisions regarding how to respond to homeless encampments." So far as it goes, that position may be correct. But here, the permanent injunction held the City responsible for a public nuisance on land it owns and controls. Again, for more than 85 years, Arizona's courts have recognized the authority of holding municipalities responsible for public nuisances on land they own and control under Arizona law. *See Johnson*, 51 Ariz. at 130.

**¶34**        The permanent injunction requires the City to abate a public nuisance on land it owns and controls, obligations consistent with (not precluded by) authority the City cites. *See Tostado v. City of Lake Havasu,* 220 Ariz. 195, 202 ¶ 32 (App. 2008) (noting A.R.S. "§ 12-820.01 does not immunize the City on the basis of legislative or administrative function immunity from Appellant's claims;" reversing summary judgment for the city and remanding); *Sensing v. Harris*, 217 Ariz. 261, 262 ¶ 1 (App. 2007) (affirming dismissal of mandamus claim seeking to require police officer to

enforce discretionary city ordinance "that generally prohibits solicitation on city streets" that did not involve a public nuisance claim); *Galati v. Lake Havasu City*, 186 Ariz. 131, 133 (App. 1996) (reversing summary judgment for city, holding the city "was not entitled to absolute legislative or administrative immunity in this case").

¶35        The City argues that the permanent injunction was improper because Plaintiffs (1) have not established irreparable harm; (2) the balance of hardships favors the City and (3) the public interest does not favor the permanent injunction. The City's argument about irreparable harm asserts that, because "the homeless encampments in the area of the HSC no longer exist," apparently given compliance with the preliminary injunction, Plaintiffs "never showed any irreparable harm that the City has actually caused." The City provides no authority suggesting that the apparent efficacy of a preliminary injunction can preclude the entry of a permanent injunction with substantially similar terms. On this record, the City has failed to show that the superior court could not conclude that Plaintiffs properly showed irreparable harm. *See Kromko v. City of Tucson*, 202 Ariz. 499, 501 ¶ 4 (App. 2002).

¶36        Turning to the balance of hardships, the City argues that complying with the permanent injunction "poses significant difficulties for the City." The City concedes, however, that the permanent injunction "compels the City to 'obey the law.'" If, indeed, that is the case, the City has failed to show how obeying the law would pose "significant difficulties."[4] Nor does the record include any filings seeking an order to show cause or other formal efforts alleging a failure to comply with the preliminary or the permanent injunctions. The City argues it was required "to erect new shelter space to accommodate the substantial population of unsheltered individuals near the HSC." That undertaking, however, apparently has already occurred, meaning it would not pose future "significant difficulties" for the City. The City argues, albeit without citation, that "[c]onstructing and operating shelters is incredibly expensive." The City adds, however, that it "has committed to the construction of these facilities." The City fails to tie those costs to the requirement it abate the public nuisance on property it owns and controls in the Zone to show the

---

[4] In making this argument, the City cites *Mancero-Ramirez v. City of Hoover*, 2006 WL 8436600 (N.D. Ala. June 14, 2006), a non-binding, unpublished decision, which is not proper authority here. *See* Ariz. R. Sup. Ct. 111(d), 111(c)(1)(C).

superior court abused its discretion in weighing the balance of hardships by entering the permanent injunction. *See id*.

¶37        The City next argues that compliance with the permanent injunction risks violating a preliminary injunction in a federal lawsuit. The City adds, however, that the federal court modified its preliminary injunction in October 2023, a month *after* the permanent injunction issued here. Moreover, to the extent the City expresses concern about making determinations required by a federal court injunction, and about "the definition of 'appropriate shelter'" specified in federal court, the federal court (not this court) would be the venue for appropriate clarification or relief. Again, on this record, the City has failed to show the superior court erred in weighing the balance of hardships. *See id*.

¶38        Finally, the City seeks reversal of the permanent injunction "because if it remains in force, it will intrude on the autonomy of local government to address homelessness." But, as noted above, the permanent injunction requires the City to abate a public nuisance on the property it owns and controls in the Zone and prohibits the City "from continuing to maintain a public nuisance" on that property. The City has not shown how requiring a municipality to abate a public nuisance on property it owns and controls and prohibiting a municipality from maintaining a public nuisance on that property impermissibly intrudes on that municipality's autonomy or will, as the City argues, "extends the application of nuisance law as a weapon to compel police action, with far-reaching implications throughout Arizona and potentially the United States."

## IV.    Attorneys' Fees and Costs.

¶39        The superior court awarded Plaintiffs' $214,960.50 in attorneys' fees and $6,124.03 in taxable costs pursuant to A.R.S. § 12-348 and 12-2030 as well as the "private attorney general" doctrine. *See Ansley*, 248 at 152-53. Other than challenging the merits of the preliminary and final injunctions, the City does not challenge those awards.

¶40        Plaintiffs seek their taxable costs on appeal as well as an award of attorneys' fees on appeal primarily under the private attorney general doctrine, but also under A.R.S. §§ 12-348(A)(4), 12-348(A)(7), 12-2030, 12-341 and 12-1840. The City has not objected to those requests. The private attorney general doctrine provides that fees may be awarded to "a party who has vindicated a right that: (1) benefits a large number of people; (2) requires private enforcement; and (3) is of societal importance." *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 8 ¶ 26 (2013). Similarly, a

prevailing party like Plaintiffs here may be awarded fees against a municipality in a mandamus action. See A.R.S. § 12-2030(A).[5]

¶41 The City does not dispute that Plaintiffs' request for attorneys' fees is authorized by the private attorney general doctrine and A.R.S. § 12-2030(A). Nor has the City presented any other objection to Plaintiffs' request for attorneys' fees. Accordingly, the court awards Plaintiffs' their taxable costs incurred on appeal, and, in the court's discretion, their reasonable attorneys' fees incurred on appeal, contingent upon their compliance with ARCAP 21. *Accord Schires v. Carlat*, 250 Ariz. 371, 379 ¶ 25 (2021).

### CONCLUSION

¶42 The permanent injunction is affirmed as clarified such that the "public property" referenced is limited to public property the City owns and controls in the Zone but does not apply to property owned or controlled by other public entities; by nonprofit organizations or by private individuals or companies.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV

---

[5] Given this authority, the court does not address Plaintiffs' requests for an award of fees under A.R.S. § 12-348.